In re BRYSON PROPERTIES XVIII.

The TRAVELERS INSURANCE
COMPANY, Plaintiff/Appellant,

v.

BRYSON PROPERTIES XVIII,
Defendant/Appellee.

Nos. B–89–12311–C–11, 2:90CV00451.

United States District Court,
M.D. North Carolina,
Greensboro Division.

Feb. 8, 1991.

Thomas B. Henson, Allen K. Robertson, Charlotte, N.C., for plaintiff/appellant.

William P. Miller, High Point, N.C., John A. Northen, Chapel Hill, N.C., for defendant/appellee.

## MEMORANDUM OPINION

BULLOCK, District Judge.

This appeal concerns the propriety of the bankruptcy court's confirmation of the reorganization plan of Debtor Bryson Properties XVIII (hereinafter "Bryson"). Following a decline in the demand for office space and the discovery of asbestos in three Omaha, Nebraska, office buildings owned by the Debtor, the Debtor sought bankruptcy relief to enable it, among other things, to rework its loan obligations to The Travelers Insurance Company (hereinafter "Travelers"). Travelers, which loaned millions to the previous owner of the buildings, and which now stands to receive millions less back, challenges its treatment under the bankruptcy court approved reorganization plan. When Bryson acquired the buildings, known as "Mid America Plaza," in 1986, it took them subject to Travelers' $10.8 million security interest protecting its loan.

Finding no error in the handling of this case by the bankruptcy court, the court will affirm the decision approving the Debtor's reorganization plan.

## BACKGROUND

The Debtor filed for bankruptcy in September of 1989, after properly making payments on the Travelers loan for approximately three years. Bryson alleges that its bankruptcy was caused by the departure of a major tenant from its office buildings, the discovery of a tremendous asbestos pollution problem in all three buildings, and the general decline in real estate values (including rental values) in the economy, among other factors. Travelers is the largest single creditor to file a claim against the Debtor's estate.

After the Debtor submitted plans that were unacceptable because of their failure to treat Travelers fairly, the bankruptcy court confirmed the Debtor's Third Amended Plan of Reorganization (hereinafter the "Third Plan"). It ruled that the Third Plan was consistent with the requirements of 11 U.S.C. § 1129, that the Plan did not discriminate against Travelers, and that it treated Travelers fairly and equitably.[1]

The Third Plan differentiates between Travelers' secured interest in the property ($7,905,068.00), and Travelers' unsecured interest ($3,329,238.03). Both parties agree that these figures represent the correct amounts of the claims.[2]

Under the terms of the Third Plan, Travelers purportedly would receive an amount in the future equivalent to the present value of its secured claim. Travelers disputes the Debtor's claim that the payments it would receive under the Plan have a present value, when discounted for inflation, loss of use, etc., equal to the value of the secured claim. Travelers correctly points out that as a secured creditor it is entitled to receive an amount equal to the value of its secured claim as of the date the Third Plan was approved.

Travelers specifically objects that the Plan's provision for interest payments at an escalating rate, running from 9.25% to 10.5%, and averaging a return of 9.79% per year over the next ten years, is inadequate.[3] At the end of the ten years, Travelers is to be paid all remaining principal owed on its secured claim.

Travelers will receive an additional return on its secured claim if Mid America Plaza is sold within ten years. Should the buildings be sold or refinanced before the end of the pay-back period, Travelers would receive its secured principal, then new capital infused into the enterprise by its reorganizers would be repaid to them, and then Travelers would receive a payment equal to the difference between $7,905,068.00 and the original $10.8 million that it was to receive, amortized at a rate of 5.25% per year. Additionally, Travelers would receive one-third (⅓) of any profit made above and beyond the amount needed to make the payments on the secured claim listed above, should the sale of Mid America Plaza yield such profits.

Regarding the unsecured debt owed Travelers, the Debtor proposes to pay only 3.5% as full satisfaction of the debt. Third Amended Plan of Reorganization at 12 (filed June 18, 1990). This proposal draws something more than a mild expression of discontent from Travelers because the other unsecured creditors of the Debtor will recoup more than just this payment of 3.5%; the Third Plan requires the general partner and partner guarantor of the bankrupt partnership to pay *all* of the remaining amounts owed on the other unsecured claims within thirty days of the Third Plan's approval. *Id.*

---

1. Hearing before the Honorable Jerry G. Tart at 26 (June 25, 1990).

2. The Appellant actually states that the amount of the unsecured claim is three cents higher than the Appellee does. Without taking a position on the proper amount of the unsecured claim, the court will assume for the purposes of its discussion that the Appellant's claim is correct. The bankruptcy court can resolve this dispute if it is necessary for a court to do so at some later date.

3. The parties agree that the average rate would be 9.79%. Brief of Appellant at 13; Brief of Appellee at 12.

Not only do the parties disagree on the question of whether the Third Plan unfairly discriminates against Travelers and fails to treat its claims fairly and equitably, but as an initial matter they cannot agree on the standards of review to apply. In particular, the Appellant contends that (1) the Third Plan does not assure it payment of an equivalent to the present value of its secured claim, (2) the Plan unfairly discriminates against Travelers' unsecured claim by paying other unsecured claims in full and only a few cents of each dollar owed it, (3) the Third Plan is not fair and equitable for various reasons, and (4) the entire case should be reviewed *de novo*.

## DISCUSSION

### A. *The Standard of Review*

■ The court must first consider the standard of review. Bankruptcy Rule 8013 provides in part, "Findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the bankruptcy court to judge the credibility of the witnesses." Thus, "factual findings should not be disturbed unless clearly erroneous," while "legal conclusions are subject to *de novo* review." *Quinn Wholesale, Inc. v. Northen*, 100 B.R. 271, 273 (M.D.N.C.1988), *aff'd*, 873 F.2d 77 (4th Cir.), *cert. denied*, ─── U.S. ───, 110 S.Ct. 151, 107 L.Ed.2d 109 (1989).

A significant issue in this case is the bankruptcy court's determination that Travelers will receive an amount equal to the present value of its security in Mid America Plaza under the Third Plan. The bankruptcy court's determination was based upon evidence of how interest rates fluctuate with the length of a loan, Treasury Bill interest rates, the testimony of a witness from the banking industry, and other factors. While the Appellant would have this court review the evidence anew, under a *de novo* standard, at least two circuit courts have gone the other way. They have held that decisions concerning money value made by bankruptcy courts are *not* reviewed *de novo*. In the context of evaluating the value of property contrib-

uted to a reorganizing debtor, as well as the value of an interest rendered by the debtor, the Seventh Circuit held that deference was owed decisions of the bankruptcy court. *In re Potter Material Serv., Inc.*, 781 F.2d 99, 103–04 (7th Cir.1986). The court explained,

> The court based its valuation of Potter upon 'the Debtor's past earnings record, the state of the economy, the highly competitive nature of the Debtor's business, the present financial position of the Debtor and the Debtor's projections of future earnings.' The valuation of a corporate Debtor is a complex task, requiring an evaluation of considerable data concerning the past, present, and future operations of the Debtor. Unless the creditors challenging a 'cram-down' reorganization can show that the court made an erroneous evaluation, this court will not reweigh the evidence on appeal.

*Id.* at 104. Likewise, the Ninth Circuit considered "a single issue" in *In re Camino Real Landscape Maintenance Contractors*, 818 F.2d 1503, 1504 (9th Cir.1987): "[W]hat rate of interest on deferred payments ... will provide the government payments having a present value equal to the amount of its claim." The court explicitly stated that while the issue before it concerned a tax claim, it intended its decision to apply as well to present value questions under 11 U.S.C. § 1129(b)(2)(A). *Id.* n. 1. *Camino Real* then held that the bankruptcy court's determination of what future payments would have a present value equal to the present value of the creditor's claim "should be accorded substantial deference." 818 F.2d at 1508.

In the same vein, this court will accord substantial deference to the bankruptcy court's conclusion that Travelers will receive an amount equal to the present value of its secured claim under the Third Plan; that court's evaluation will not be set aside unless shown to be clearly erroneous. On the other hand, as indicated above, questions of law raised by the Appellant will be reviewed *de novo*.

B. *Is the Present Value of Travelers' Secured Claim Protected?*

■ 11 U.S.C. § 1129 sets out certain prerequisites to the approval of a bankruptcy reorganization plan despite the objection of one class of the estate's creditors. Among the fundamental requirements is a rule that the plan must deal with dissenting creditors fairly and equitably. Moreover, a plan cannot be found fair and equitable unless the requirements of 11 U.S.C. § 1129(b)(2) are met. For secured claims, one such requirement is that the plan must ensure "that each holder ... receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property." 11 U.S.C. § 1129(b)(2)(A)(i)(II). Compliance with this provision may involve payment of one lump sum at some future date, which when discounted has a present value equal to that of the secured claim, or payment of a series of installments which when discounted are together the equivalent of the secured claim in current dollars. *See Bankruptcy Law Revision: Report of the Committee on the Judiciary,* H.Rep. No. 595, 95th Cong., 1st Sess. 414–15 (1977), U.S.Code Cong. & Admin.News 1978, p. 5787. Alternatives to future payment of the present value of the secured claim are the current payment of any "indubitable equivalent" to the cash value of the secured claim and the transfer of the creditor's liens to new property exchanged for the property the creditor has a lien against. 11 U.S.C. § 1129(b)(2)(A).

■ This court must presently decide whether the Third Plan's provisions concerning Travelers' secured claim, including interest at an average rate of 9.79% over a ten-year period, the payment of a lump sum equal to the principal owed at the end of the ten years, and participation in the proceeds of a possible sale of Mid America Plaza, were collectively equal to the value of Travelers' interest in the collateral for its loan ($7,905,068.00) on the date the bankruptcy court confirmed the Plan. The court will, as indicated above, review the bankruptcy court's evaluation under a clearly erroneous standard.

At the May 22, 1990, hearing on the Second Amended Plan proposed by the Debtor, the bankruptcy court received evidence on commercial interest rates for five- and ten-year loans. For ten-year loans made by insurance companies on income property, the evidence showed that the interest rates fluctuated between 9.25% and 11% over the three years prior to the confirmation of the Third Plan (the Plan was confirmed in June of 1990). In the last year before confirmation, the rate fluctuated between 9.25% and 10.5%.

The return paid on ten-year Treasury Bills on the date of the hearing was 8.74%. A witness experienced at arranging financing for income-producing real estate and employed by a mortgage banking company explained that typical rates for ten-year loans would be about 1.1% to 2% higher than the Treasury Bill rate. Hearing before the Honorable Jerry G. Tart at 41 (May 22, 1990). The witness also said that lenders possibly receiving a percentage of profits from a sale of real estate securing a loan would typically lower the interest rate charged. *Id.* at 45–46.

In light of the evidence received by the bankruptcy court, this court does not believe that the confirmation of a plan providing for payment of an average return of 9.79% was improper. While the court did see evidence that interest rates are often higher where a loan is for the full current value of commercial property (allowing no cushion to a lender should the property depreciate), reorganization is approved only where the debtor is believed likely to succeed at its reorganization efforts. *See* 11 U.S.C. § 1129(a)(11). Thus, the bankruptcy court did determine that the Debtor will in all probability be able to meet its commitments under the Plan and this court will not deem the treatment of Travelers inadequate on that basis. All in all, the bankruptcy court's finding that Travelers will receive an amount equal to the present value of its secured claim under the terms of the Plan seems reasonable.

## C. *Discrimination Against the Unsecured Claim*

■ In addition to requiring that reorganization plans pay dissenting creditors an equivalent to the present value of their claims, Section 1129 requires that they not be unfairly discriminated against under the plans.

■ As indicated above, the Third Plan does require full payment of the unsecured claims of minor creditors (Continental Bank is owed $602,771.00 and the trade creditors are owed $83,574.85), and only fractional repayment of Travelers' unsecured claim (for over $3 million). Nonetheless, the payment of any portion of the unsecured creditors' claims exceeding 3.5% of those claims will not be made by the Debtor, but by the partners *who are already liable for that money*. As a matter of partnership law, it is undisputed that the general partner of the Debtor is accountable for certain obligations of the Debtor despite the bankruptcy of the partnership. *See* 9 *Am.Jur.*2d *Bankruptcy* § 265 (1980). Similarly, despite the partnership's bankruptcy, the guaranteeing partner is liable for the obligation he personally guaranteed would be repaid. While Travelers bemoans the fact that the Plan reassures the other creditors that their claims will be honored by the partners, it should be noted that the Code itself recognizes the enforceability of recourse debt against an insolvent partnership's general partners. 11 U.S.C. § 723. The Third Plan does therefore make some distinction in its treatment of the unsecured creditors, but the Plan is not the source of Travelers' disadvantage. The distinction made by the Third Plan is simply not one prohibited by the Code.

■ In a much quoted passage, *Collier on Bankruptcy* explains how courts may recognize unfair discrimination. "Reducing 'discrimination' to its bare essentials, a dissident class must not only receive 'fair and equitable' treatment, but the class must also receive treatment which allocates value to the class in a manner consistent with the treatment afforded to other classes with *similar legal claims* against the debtor." 5 *Collier on Bankruptcy* ¶ 1129.03, at 1129–68, –69 (15th ed. 1990) (emphasis added). Where legal claims are sufficiently different as to justify a difference in treatment under a reorganization plan, reasonable differences in treatment are permissible. Many courts have already taken this position, and surely it is consistent with the Code's indication that only *unfair* discrimination will not be tolerated. *See In re Aztec Co.*, 107 B.R. 585, 589–91 (Bankr.M.D.Tenn.1989) (providing a long list of distinctions that have been found acceptable in certain reorganization cases under varying circumstances); *In re Johns–Manville Corp.*, 68 B.R. 618, 636 (Bankr.S.D.N.Y.1986) ("In the present case, the interests of the Class 8 common shareholders are not similar or comparable to those of any other class. Thus, this court finds no unfair discrimination."); *cf. In re Meadow Glen, Ltd.*, 87 B.R. 421, 426–27 (Bankr.W.D.Tex.1988) (unsecured creditors "must be treated equally unless there are valid reasons to do otherwise"); *In re Baugh*, 73 B.R. 414, 417 (Bankr.E.D.Ark. 1987) (where there was no proper basis for distinguishing between the unsecured claim of a judgment creditor and other unsecured creditors, a plan could not legally discriminate between unsecured creditors). In this case, the claims of the two unsecured creditors treated differently *are* dissimilar to Travelers' claim. The minor difference in treatment under the Third Plan—restatement of the legal reality that the general partner and the partner guarantor of the Debtor are not off the hook for the portion of claims left unpaid by the Debtor—is justified.

■ The court acknowledges that one sentence in 11 U.S.C. § 1111(b)(1)(A) is ambiguous and provides some support for the Appellant's argument that the Third Plan should not discriminate between the unsecured creditors. That statute provides, "A claim secured by a lien on property of the estate shall be allowed or disallowed ... the same as if the holder of such claim had recourse against the debtor on account of such claim ... unless [the creditor elects to treat the allowed claim as completely secured]." The Appellant claims that this

provision prohibits discrimination in a reorganization plan on the basis of whether a claim is enforceable against the partners of a bankrupt partnership personally or not. Appellant's Brief at 18. This court declines to interpret Section 1111(b) as the Appellant would have it.

To take the Appellant's view would be to create a possible windfall for creditors in certain cases upon the filing of a bankruptcy petition, suddenly allowing them to collect from partners personally whereas before filing they could seek repayment only from the partnership itself on their non-recourse loans.

The Appellee correctly notes that *Collier on Bankruptcy* takes the position that the recourse conversion provision of the Code should not change the status of non-recourse debt as it relates to the partners of a bankrupt partnership. 5 *Collier on Bankruptcy* ¶ 1111.02, at 1111–23 (15th ed. 1990). If the section is not to create new liability for the partners themselves then, despite the filing of the bankruptcy petition, Travelers' claim would not be enforceable against any Bryson partner. It follows that whether the Third Plan mentioned the liability of partners for the other unsecured claims or not the partners would be liable for those claims and only those claims. To that extent, the references in the Third Plan to repayment of the remainder of certain unsecured claims by the partners are mere surplusage.

The Appellant might wish to respond that the court's interpretation renders Section 1111(b) meaningless, but that is not so. One scholar has explained the meaning of the Section 1111(b) conversion of claims to "recourse" status as having the effect of simply preventing secured claims which exceed the value of the collateral securing them from the strip-down provisions of Sections 502(b)(1) and 506 of Title 11.

Recall that in a liquidation case under chapter 7, the holder of a nonrecourse claim has an allowed secured claim to the extent of the value of the collateral and no claim for any deficiency. However, in a reorganization case under chapter 11, the claim is allowed under section 1111(b) as if the creditor has recourse and the creditor is given an unsecured claim for the deficiency.

Klee, *All You Ever Wanted to Know About CramDown Under the New Bankruptcy Code*, 53 Am.Bankr.L.J. 133, 160 (1979) (footnotes omitted). In other words, were it not for Section 1111(b), Travelers could get nothing for the portion of its claim exceeding the value of the collateral. Section 1111(b) allows Travelers to either maintain its lien as fully secured or be allowed participation in the distribution of the estate's assets as an unsecured creditor (thus receiving 3.5% in this case). *See* 5 *Collier on Bankruptcy* ¶ 1111.02, at 1111–15 to 1111–28 (15th ed. 1990). Thus, the impact of the conversion to recourse status can be explained as having an effect on payment of claims in bankruptcy proceedings without changing the liability of a bankrupt partnership's partners.

The Third Plan may provide incidental benefits to the unsecured creditors who have persuaded Bryson's partners to reaffirm their obligations in the Plan. These special benefits which are not shared by all of the Debtor's unsecured creditors are not unreasonable, and this court holds that the Third Plan does not unfairly discriminate.

### D. *The Third Plan is Fair and Equitable*

As mentioned above, to be confirmed despite the objection of any of a debtor's impaired creditors a Chapter 11 reorganization plan must in its treatment of both secured and unsecured claims be fair and equitable. 11 U.S.C. § 1129(b)(1). Travelers contends that the Third Plan is not fair and equitable because Bryson's partners, whose claims are inferior to Travelers' unsecured claim, will unjustly profit from a sale of Mid America Plaza and, more generally, because bankruptcy law protection should not cover "two-party disputes." The court rejects these claims.

1. Unjust compensation and the new capital rule

■ It is fair and logical for creditors to expect that junior claim-holders will not be paid by the estate while their own more

senior claims go unsatisfied. This principle is embodied in the confirmation law's requirement that, with respect to unsecured claims, no junior class of claims will "receive or retain on account of such junior claim or interest any property" (unless senior claims of dissenting creditors are first fully paid). 11 U.S.C. § 1129(b)(2)(B).

In this case, the Appellant claims that the Plan's provision for repayment of the infusion of fresh cash and the new credit line to the Bryson partners providing those resources, out of the proceeds of a sale of Mid America Plaza, violates the rule against paying junior claim holders ahead of senior ones (called the "absolute priority rule"). The Plan provides that upon any sale or refinancing of the buildings, the secured claim will be paid, after which the line of credit provided by partners of the Debtor and then their cash contribution (of $625,000.00) will be paid back.

█ Consistent with precedent, the court holds that the repayment of new investments into a struggling debtor does not run afoul of the absolute priority rule. 11 U.S.C. § 1129(b)(2)(B) guards against improper discrimination between existing creditors of the Debtor. Certainly those with superior claims should find support in the courts when they attempt to protect their interests. But contributors of additional money to an already bankrupt company who gain a right to payment in return for their new investments are not in any way cutting in front of superior creditors in the pay-back line. Rather, the new investors "share the risk of further loss and, in return, receive benefits." Nimmer, *Negotiated Bankruptcy Reorganization Plans: Absolute Priority and New Value Contributions*, 36 Emory L.J. 1009, 1050 (1987). Surely new investment into a struggling enterprise will not come if the investors cannot receive some interest in exchange for their investments. The rule advocated by the Appellant would foil the efforts of struggling businesses to gain new resources from those most willing to risk money on a once-failed venture—the people already associated and familiar with the business. As one professor has explained,

Superficially, there may appear to be little difference if the new capital comes from the original owners [who had junior claims but who may purchase a new interest in the business] or from new investors. But this apparent symmetry often does not exist. For example, the investments are not equally available from either source. New investors cannot easily be found, while the original owners are willing to take on a new risk to keep their business.

*Id.* at 1052. With this reasoning in mind, it is not surprising that courts have long held that old junior lienholders making new capital commitments are eligible for new interests in struggling businesses under both the old Bankruptcy Act of 1898 and the new Bankruptcy Code of 1978. In *Case v. Los Angeles Lumber Prod. Co.*, 308 U.S. 106, 121, 60 S.Ct. 1, 10, 84 L.Ed. 110 (1939), Justice Douglas—a former S.E.C. head and expert on corporate fraud schemes—wrote (without dissent):

It is, of course, clear that there are circumstances under which stockholders may participate in a plan of reorganization of an insolvent debtor.... [There is a] necessity, at times, of seeking new money 'essential to the success of the undertaking' from the old stockholders. Where that necessity exists and the old stockholders make a fresh contribution and receive in return a participation reasonably equivalent to their contribution, no objection can be made.

(footnote omitted).

Professor Nimmer recently wrote,

Although developed under the former Bankruptcy Act, the new contribution concept applies in Chapter 11 cases. Section 1129(b) prohibits owners from retaining or receiving property 'on account' of their prior interests unless creditors receive full value. In a new capital case, however, the source of the owners' interests in the reorganized company is their new contribution. Ownership is not retained 'on account' of the prior interest.

36 Emory L.J. at 1051 (footnote omitted). The Sixth Circuit used just such an analysis to find that there is no prohibition in the

Bankruptcy Code against granting an interest to a contributor of new capital in its *U.S. Truck* case. *In re U.S. Truck Co.*, 800 F.2d 581, 588 (6th Cir.1986) ("The question, put in terms of the Code's language, is whether McKinlay is receiving its interest in this reorganized company 'on account of' its junior claim. This involves looking at the need for the contribution and whether McKinley paid a fair price for its interest."). In an unpublished opinion, the Fourth Circuit also held that recognition in a reorganization plan of the interests of those who provide nourishment for a sick company to survive is consistent with the Bankruptcy Code. *Quality Inns Int'l, Inc. v. L.B.H. Assocs. Ltd.*, 911 F.2d 724 (4th Cir.1990) ("Because the Class 14 claimants must make a contribution of 'money or money's worth' to retain their interest ... and because these contributions are necessary to the success of the undertaking ... the plan does not violate the absolute priority rule.") (text taken from WESTLAW).

It must, however, be noted that a wayward case from the Eighth Circuit—the first ever to hold, by a two-to-one vote, that a promise of future labor by the debtor is a sufficient contribution of new capital to evade absolute priority rule coverage—provoked the reversal of one circuit's approval of use of the new capital rule. In *In re Ahlers*, 794 F.2d 388 (8th Cir.1986), the court held that a bankrupt farmer's promise to keep working and to apply his professional expertise to keep his farm liquid if allowed to reorganize was a contribution of new capital for which the farmer could gain a superior position to that of his creditors. The dissenting judge on the Eighth Circuit offered four reasons against the majority's view. First, Judge Gibson said that a promise of future capital cannot easily be turned to another use, and is therefore not liquid and comfortgiving to creditors of the reorganizing business. 794 F.2d at 407. Second, the value of a farmer's expertise is speculative, making it difficult for senior creditors to be assured that the labor contributor will not be overcompensated at their expense. *Id.* Furthermore, unlike payments which can be required of new capital contributors under

the existing new capital rule, payment of new capital into the reorganizing business by one who will supply only labor or expertise cannot be assured prior to confirmation of a bankruptcy plan. *Id.* Finally, Judge Gibson reasoned that a labor-only contribution was inconsistent with what the Supreme Court intended the new capital rule to encompass when it recognized the rule in 1939. *Id.* Adopting much of Judge Gibson's reasoning, the Supreme Court reversed the holding of the circuit court. *Northwest Bank Worthington v. Ahlers*, 485 U.S. 197, 108 S.Ct. 963, 99 L.Ed.2d 169 (1988). Moreover, it also observed that a new statutory scheme had been adopted since *Los Angeles Lumber* was decided, and then left open the question of whether the new capital rule had worn out its welcome at the Supreme Court. *Id.* 485 U.S. at 203 n. 3, 108 S.Ct. at 967 n. 3 ("Thus, our decision today should not be taken as any comment on the continuing vitality of the *Los Angeles Lumber*" new capital rule.).

Considering the Supreme Court's suggestion that the new Bankruptcy Code could have eliminated the new capital rule, and having reviewed the authorities discussed above, among others, the court believes that the reasoning used by Professor Nimmer and the Sixth Circuit should apply in this case. So long as the benefits provided by the contributor of necessary new capital under a reorganization plan do not exceed a reasonable estimation of the value of the new contribution, the absolute priority rule has not been violated.

The Appellant contends that even if the new capital rule survives it does not apply here because the contributors will receive in exchange a return "greater than their contribution." Appellant's Brief at 27. The court does not agree. As discussed above, the Plan provides only for possible reimbursement of the contributions of the new capital contributors, in amount and form identical to the contributions. The exchange is certainly not a return of something greater than the proposed new investment. Additionally, there is no question that new capital is needed here to pay for asbestos clean-up and the continued

operation of the partnership. The new capital rule has therefore properly been applied by the bankruptcy court.

### 2. Bankruptcy protection in two-party disputes

██ Finally, Travelers contends that the third plan is not fair and equitable because it is involved in a two-party dispute with the Bryson partnership, and that bankruptcy protection here merely serves to allow the venture to renegotiate the terms of the Travelers' loan. Appellant's Brief at 21. The court finds the Appellant's argument unpersuasive.

Travelers' argument unmistakably falls into the cateogory of claims discussed in the Fourth Circuit's opinion deciding *Carolin Corp. v. Miller*, 886 F.2d 693, 700–05 (4th Cir.1989). There, the court said that determination of "whether the petitioner's real motivation is to 'abuse the reorganization process'" requires analysis of whether the bankruptcy petition was filed in bad faith. *Id.* at 702 (quoting *In re Thirtieth Place, Inc.*, 30 B.R. 503, 505 [Bankr.9th Cir.1983]). Not surprisingly, in one of the two district court cases cited in support of the Appellant's abuse of bankruptcy argument, the claim is also treated as a question of bad faith. *In re Landmark Capital Co.*, 27 B.R. 273, 279–81 (Bankr.D.Ariz. 1983). (The only other case cited by the Appellant for the proposition that this dispute should not be subject to bankruptcy law resolution because it is a two-party dispute is a case in which a reorganization plan was not approved because one of the essential prerequisites to approval of a forced reorganization plan—approval of the plan by at least one class of impaired creditors—was not met. *In re Anderson Oaks (Phase I) Ltd.*, 77 B.R. 108, 111 [Bankr. W.D.Tex.1987]. In this case impaired classes of creditors have accepted the plan.)

The court will follow the mandate of *Carolin Corp.* and will treat the question of whether bankruptcy protection was invoked for an improper purpose as a question of bad faith. *Carolin Corp.* held that, in order to find that a proposed plan would be outside the scope of bankruptcy law

coverage for want of good faith, *"both* objective futility [of rehabilitating the bankrupt debtor] and subjective bad faith [must] be shown." 886 F.2d at 700 (emphasis in original). The court added that a bad faith inquiry requires examination of the "totality of circumstances," and held that a bankruptcy court's finding that a filing was or was not in good faith would be reviewed subject to a clearly erroneous standard. *Id.* at 701–02.

██ In this case, the bankruptcy court disagreed with the Appellant, finding that bankruptcy protection was invoked in good faith. A major asbestos clean-up of Mid America Plaza must be undertaken, but once this effort is completed the Debtor should be in a healthier position. *Cf. Carolin Corp.*, 886 F.2d at 702 (holding company which had much unrented space in its fire-damaged property made no effort to repair property or to infuse new operating funds into the business, but sought the discharge of its debts and reorganization under Chapter 11). This court does not have an abundance of evidence as to the future profitability of the Bryson partnership, but the burden is on the Appellant to show that the bankruptcy court's finding of good faith was clearly erroneous, and it has not met that burden. Neither bad faith nor futility has been proven, though both are prerequisite findings to a reversal of the bankruptcy court's finding of good faith.

This court therefore rejects the Appellant's claim that the reorganization plan is not fair and equitable because the Debtor entertained an improper motive.

### CONCLUSION

The Supreme Court recently stated, "[A] central purpose of the Code is to provide a procedure by which certain insolvent debtors can reorder their affairs, make peace with their creditors, and enjoy a 'new opportunity in life with a clear field for future effort, unhampered by the pressure and discouragement of pre-existing debt.'" *Grogan v. Garner*, — U.S. —, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991) (quoting *Local Loan Co. v. Hunt*, 292 U.S. 234, 244, 54 S.Ct. 695, 699, 78 L.Ed. 1230 [1934]). When a business in our interdependent

commerical community becomes unable to pay its debt, it is an unfortunate reality that some entity must bear the expense of not being paid what it is owed. Here, Travelers' secured claim will be protected with payment of an equivalent to the present value of the claim. No unfair discrimination against Travelers' unsecured claim has been found, since the minor distinction in treatment of unsecured claims by the Third Plan is little more than a restatement of the reality that partners already bound for partnership liability must pay their debts. Travelers enjoys no similar right of action against individual partners to that of the holders of the other unsecured claims. Overall, this court believes that the bankruptcy court's determination that the Third Plan complied with the requirements of 11 U.S.C. § 1129 was not erroneous, as judged under the standards of review discussed above.

An order in accordance with this memorandum opinion shall be entered contemporaneously herewith.

### ORDER

For the reasons set forth in the memorandum opinion filed contemporaneously herewith,

IT IS HEREBY ORDERED that the decision of the bankruptcy court be, and the same hereby is, AFFIRMED.