**In re GUILFORD TELECASTERS, INC., trading and doing business as WGGT–TV, Debtor.**

**Bankruptcy No. B–86–02633C–11.**

United States Bankruptcy Court, M.D. North Carolina.

May 28, 1991.

Rayford K. Adams, III, Greensboro, N.C., for debtor.

Richard M. Hutson, Durham, N.C., for shareholders.

Walter Rand, Greensboro, N.C., for Continental Bank, N.A.

## MEMORANDUM OPINION

JAMES B. WOLFE, Jr., Chief Judge.

On December 31, 1986, Guilford Telecasters, Inc., trading and doing business as WGGT–TV ("Debtor"), filed a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code. On August 7, 1989, Kathrine R. Everett, Robinson O. Everett, James Thrash, Roy O. Rodwell and such other shareholders of the Debtor who elect to participate, filed a plan of reorganization. The plan of reorganization was subsequently modified and amended. On March 20, 1991, a hearing was held on the confirmation of the amended plan and on the proponents' "cram-down" motion to confirm the plan over dissenting classes pursuant to 11 U.S.C. § 1129(b)(1).

Objections to confirmation of the plan were filed by Continental Bank N.A., formerly Continental Illinois National Bank and Trust Company of Chicago ("Continental"), and the Official Committee of Unsecured Creditors ("Committee"). At the hearing on March 20, 1991, the Committee withdrew its objection to the plan and Continental's objection remained for disposition. In open court, Thomas Cookerly and George W. Lyles, Jr., shareholders of the Debtor, joined Continental in objecting to the plan.

At the confirmation hearing, extensive evidence was heard on behalf of the proponents and Continental. The objecting shareholders did not participate in the hearing other than noting their objection for the purposes of the record. This opinion shall constitute the Court's findings of fact and conclusions of law. A separate order will be issued consistent with these findings and conclusions.

This Court has jurisdiction over the parties and subject matter of this proceeding pursuant to 28 U.S.C. §§ 151, 157 and 1334 and the Standing Order of Reference entered by the United States District Court for the Middle District of North Carolina. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(L) in which this Court may exercise its full authority to hear and determine the matter and issue a final order.

The Debtor, a North Carolina corporation, is engaged in the business of operating an independent UHF television station in the Greensboro/Winston–Salem/High Point market area. The Debtor was licensed during 1981 and aired its first full telecast on May 9, 1981. The Debtor enjoyed continual growth until 1985. Beginning in late 1985, the Debtor suffered severe financial setbacks for a variety of reasons and, ultimately, on December 31,

1986, the Debtor filed a Chapter 11 petition in this Court.

Until August 1989, the Debtor was unable to foster a plan of reorganization. Prior to the filing of the plan, efforts were made by the Debtor and Committee to sell the station; however, negotiations with prospective purchasers never resulted in a purchase agreement.

Two years prior to the petition date, Continental and the Debtor entered into a loan agreement wherein Continental agreed to loan the Debtor $4.2 million. The agreement between the parties provided for interest only for one year and thereafter principal, with interest at Continental's prime rate, plus one and one-half (1–½%) percent, would be paid over a period of six years. Continental held as collateral a security interest in the Debtor's equipment, furniture, fixtures, contracts, accounts receivable, and general intangibles.

The Continental loan was additionally secured by a pledge of the common stock of the Debtor and was further guaranteed by the shareholders of the Debtor. Each shareholder's personal guaranty was equal to approximately 135% of his ownership percentage in common stock of the Debtor.

On December 31, 1986, the petition date, Continental was owed approximately $4.1 million. After the filing of the petition, the Debtor made payments to Continental through May 1987 and thereafter the Debtor defaulted and the shareholder guarantors paid $2,688,415.84 in principal and interest.

On August 3, 1987, an Order Recognizing Subrogation Rights ("Subrogation Order"), with consent of all parties, was entered by this Court, which provided that upon payment of the "Guaranteed Indebtedness" (as defined in the Subrogation Order) to Continental, including principal, interest, attorney fees and legal expenses, the shareholder guarantors would be subrogated to the rights of Continental against the Debtor. At the time of the confirmation hearing, Continental was owed $2,808,005.95 in principal and accrued interest of $182,258.37 and $2,688,416.00 was owed to the shareholder guarantors by way of subrogation. Continental has not made application to this Court for attorney fees and legal expenses from the Debtor. Any fees and expenses to be paid by the Debtor may only be allowed upon application to this Court and in accordance with 11 U.S.C. § 506(b).

## THE PLAN

The plan as amended classifies and treats claims as follows:

Class I: *Administrative Claims.* These claims shall be paid in full on the "closing date" of the plan (the first day of the next calendar month following the time that the order confirming the plan becomes a final order) unless otherwise agreed between the Debtor and the claimant.

Class II(A): *Priority Wage Claims.* These claims shall be paid in full on the closing date.

Class II(B): *Priority Tax Claims.* These claims shall be paid in full on the closing date.

Class III: *Continental.* The indebtedness due Continental will be modified as follows:

(i) Any delinquent interest due prior to the closing date shall be added to and become part of principal.

(ii) On the closing date, the interest rate due on the claim of Continental Bank shall be prime plus one and one-half percent (1–½%).

(iii) The maturity date shall be extended, and the Debtor shall pay interest only in quarterly installments commencing on the first day of the next calendar quarter following the closing date and for seven calendar quarters thereafter, and commencing on the first day of the ninth calendar quarter the Debtor shall pay interest plus quarterly installments to equal annual principal payments as follows:

| | Total Annual Principal Payments |
|---|---|
| Year 3 | $ 250,000.00 |
| Year 4 | 300,000.00 |
| Year 5 | 600,000.00 |
| Year 6 | 825,000.00 |
| Year 7 | 1,000,000.00 |

(remaining balance to balloon with last payment)

(iv) The modification of the debt due Continental shall not affect the liability of any guarantor, endorser or surety for such debt.

(v) Guarantors who have made payments to Continental on the indebtedness shall be subrogated to the rights of Continental as provided for under the Subrogation Order of the Court dated August 3, 1987.

(vi) The capital stock of the Debtor issued to the plan proponents shall not be pledged or subject to a security interest in favor of Continental.

(vii) Except as modified herein, the present terms of the promissory note, security agreement and other loan documents shall remain effective and the reorganized Debtor shall execute such modifications and agreements to effectuate the terms of this plan as Continental may reasonably request.

Class IV: *Unsecured Claims of $500.00 or Less*. These claims shall be paid in full on the closing date.

Class V(A): *Trade Creditors with Claims over $500.00*. These claims shall be paid 10% on the closing date. The approximate amount of claims in this Class is $142,670.00.

Class V(B): *Film Creditors*. These claims will be paid 7.87% on the closing date together with the right to participate in 10% of gross revenue collected by the Debtor in excess of $2.2 million during the years 1991–1995, inclusive; provided, however, if total distribution does not equal 10% on each allowed claim in this Class, then the Debtor will be required to pay the difference on March 15, 1996. The approximate amount of claims in this Class is $9,679,634.00.

Class VI: *Unsecured Loans Due Shareholders*. These claims shall be deemed to have been capital contributions and received no distribution.

Class VII: *Shareholders' Interests*. All outstanding stock shall be cancelled on the closing date.

The plan further provides that the proponents will contribute $600,000.00 cash on the closing date in order to fund the plan which allows the Debtor the means to comply with the plan. In return for the $600,000.00, the proponents will receive common stock in the Debtor pro-rata to their respective contributions. All present shareholders of the Debtor will be entitled to participate in an amount equal to their respective present ownership interest. After consummation of the plan, the proponents will be the sole shareholders of the reorganized Debtor.

According to the plan, Classes I, II(A), II(B) and IV are unimpaired. All other classes have accepted the plan with the exception of Class III (Continental) and Class VII (shareholders). The shareholders are eliminated and deemed not to accept the plan under § 1126(g). Continental objected to the plan upon the grounds that:

1. The plan is not feasible under the provisions of § 1129(a)(11);

2. The plan is not fair and equitable to Continental within the meaning of § 1129(b)(2) in that Continental does not receive under the plan deferred cash payments of at the least the value of its secured claim;

3. The plan is not otherwise fair and equitable to Continental; and

4. All the present issued and outstanding capital stock of the Debtor is pledged to Continental to secure its claim, but the plan provides for the capital stock to be issued in the future to the plan proponents free of any pledge to Continental.

■ In order to confirm a reorganization plan, the Bankruptcy Court must be satisfied that the plan complies with all requirements of 11 U.S.C. § 1129(a). The burden of establishing these requirements lies with the proponents of the plan. *In re Trail's End Lodge, Inc.*, 54 B.R. 898 (Bankr.D.Vt. 1985); and *In re Prudential Energy Co.*, 58 B.R. 857 (Bankr.S.D.N.Y.1986). The Court is satisfied that the plan meets all applicable requirements of § 1129 other than § 1129(a)(8) since Class III (Continental) has not accepted the plan and Class VII (shareholders) is eliminated and deemed not to have accepted the plan.

The plan has been accepted by Classes V(A) and V(B) who are not insiders and, therefore, the plan is confirmable if all other conditions are met. *In re Ruti–Sweetwater, Inc.*, 836 F.2d 1263 (10th Cir. 1988).

The plan may be confirmed over the objections of Continental and the shareholders through the use of "cram-down" as provided in § 1129(b)(1). This section permits the Court on request of the proponents to confirm the plan if the plan does not discriminate unfairly and if it is "fair and equitable" to Continental and the shareholders.

### FAIR AND EQUITABLE

■ The term "fair and equitable" with respect to secured claims is defined by § 1129(b)(2)(A) to mean:

(i) (I) that the holders of such claims retain the liens securing such claims, whether the property subject to such liens is retained by the Debtor or transferred to another entity, to the extent of the allowed amount of such claims; and

(II) that each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property;

(ii) for the sale, subject to section 363(k) of this title, of any property that is subject to the liens securing such claims, free and clear of such liens, with such liens to attach to the proceeds of such sale, and the treatment of such liens on proceeds under clause (i) or (iii) of this subparagraph; or

(iii) for the realization by such holders of the indubitable equivalent of such claims.

The treatment of Continental's debt does not discriminate unfairly against Continental and meets the statutory criteria of fair and equitable. Continental will retain its lien on its collateral that has value and receive deferred cash payments totaling at least the allowed amount of its claim, of at least the value of Continental's interest in the estate's interest in the collateral. 11 U.S.C. § 1129(b)(2)(A)(i). Upon payment to Continental of the "Guaranteed Indebtedness" as provided for in the Subrogation Order, the shareholder guarantors will be entitled to be subrogated to Continental's position and receive payment in accordance with the Subrogation Order.

■ If a plan proposes to pay a secured claim in installments, the present value of the future payments must equal the amount of the creditor's secured claim. To accomplish payment of present value, interest at an appropriate discount rate must be added to the installment payments. *In re Bryson Properties XVIII*, 129 B.R. 440 (M.D.N.C.1991). The appropriate discount rate should reflect the prevailing market rate of interest. *In re E.I. Parks No. 1 Ltd. Partnership*, 122 B.R. 549 (Bankr. W.D.Ark.1990).

The interest rate to be paid Continental is its prime rate plus 1–½%, which is a floating rate and Continental's contract rate under the original loan. The Court finds that this is a market rate of interest for a loan of a term equal to the payout period, with due consideration of the quality of the collateral and the risk of subsequent default. *Matter of Southern States Motor Lines, Inc.*, 709 F.2d 647 (11th Cir. 1983). Additionally, the rate proposed in the plan is the contract rate originally negotiated between the parties and is relevant to the determination of an appropriate interest rate. *In re Club Associates*, 107 B.R. 385 (Bankr.N.D.Ga.1989); *In re Monnier Bros.*, 755 F.2d 1336 (8th Cir.1985). The interest rate as provided assures that Continental will receive an amount equal to the present value of its secured claim.

Continental argued that the plan is not otherwise "fair and equitable" in the literal sense in providing for repayment of its claim. The Court finds that the treatment of Continental's claim under the plan meets the literal meaning of being "fair and equitable". *In re Cheatham*, 78 B.R. 104 (Bankr.E.D.N.C.1987).

The plan proposes to pay Continental's claim with interest at prime plus 1–½%

over a period of seven years. For the purpose of confirmation only, under § 1129(b), the going concern value of the Debtor has been calculated to be $2.5 million and the liquidated value of Continental's collateral has been estimated at $725,000.00. The treatment of Continental's claim under the plan, if anything, is overly generous and surpasses being "fair and equitable." The amount paid by the shareholder guarantors will be repaid in accordance with the Subrogation Order, after Continental receives payment of the "Guaranteed Indebtedness", and in all events at the end of seven years by a balloon payment.

The Court finds that not only can the plan be confirmed under § 1129(b)(2)(A)(i), but also that the plan may be confirmed in that Continental realizes the indubitable equivalent of its claim under § 1129(b)(2)(A)(iii). Continental, will be paid in full under the plan with an appropriate interest rate, which treatment serves at the very least, as the indubitable equivalent of Continental's claim. The requirement of § 1129(b)(2)(A)(iii) is met where an objecting secured creditor will, under a proposed plan, receive payment in full over a reasonable period of time, with an appropriate interest rate, or if not paid in full, will have the option to foreclose on its collateral. *In re Pike's Peak Water Company*, 779 F.2d 1456 (10th Cir.1985).

■ The equity interests of the present shareholders are eliminated pursuant to the plan; therefore, this class is deemed not to accept the plan under § 1126(g). To confirm the plan the shareholders must receive property of a present value equal to the value of their ownership interests. 11 U.S.C. § 1129(b)(2)(C)(i).

The going concern value of the Debtor is far less than aggregate allowed unsecured claims against the Debtor which exceed $9.6 million, and the Debtor, under a reorganization value, is clearly insolvent. The value of the shareholders' interests is zero and, therefore, the plan need not provide for this class. In view of the Debtor's insolvency and the fact that no class of interests junior to shareholders is receiving

property of the estate, the plan does not discriminate unfairly and the treatment of shareholders is fair and equitable. Klee, *All You Ever Wanted to Know About Cram Down Under the New Bankruptcy Code*, 53 Am.Bankr.L.J. 130, 145 (1979); *Matter of Johns–Manville Corp.*, 68 B.R. 618 (Bankr.S.D.N.Y.1986).

## PLAN FEASIBILITY

■ To be feasible, a Chapter 11 plan must offer a reasonable prospect of success and be workable; however, success need not be guaranteed. *In re Monnier Bros., supra.* Section 1129(a)(11) charges the Court to find at confirmation that the proposed plan, if confirmed, is not likely to be followed by liquidation. *In re Neff*, 60 B.R. 448 (Bankr.N.D.Tex.1985).

■ In determining feasibility, courts have suggested a review of the adequacy of the capital structure; the earning power of the business; economic conditions; the ability of management; the probability of the continuation of the same of management; and any other related matter which determines the prospects of a sufficiently successful operation to enable performance of the provisions of the plan. *In re Lakeside Global II Ltd.*, 116 B.R. 499 (Bankr.S.D.Tex.1989); *In re U.S. Truck Co.*, 800 F.2d 581 (6th Cir.1986); and *In re Clarkson*, 767 F.2d 417 (8th Cir.1985).

■ Based upon the evidence in this case, the Court finds and concludes that the plan is feasible. The present management of the Debtor is under the supervision of Mr. James Thrash, who assumed this responsibility on November 1, 1989. Mr. Thrash is an original founder of the Debtor and served as manager during the successful formative years of the Debtor. The past performance and future projections prepared and submitted to the Court clearly demonstrate that the Debtor can realistically carry out the financial commitments under the plan and that the plan offers a reasonable prospect of success. *In re Monnier Bros., supra.*

Continental argued that the plan is not feasible in that the Debtor owes Continen-

628

tal more than $5.6 million in principal and accrued interest. That amount has been reduced by payment to Continental by the guarantors, so that after giving effect to the guarantor payments, Continental is owed $2,808,005.95 in principal, plus accrued interest on that amount through the Closing Date, which will bring principal and interest due to Continental to approximately $3.1 million. It is this reduced amount on which the Debtor will pay interest under the plan. This is within the spirit of the Subrogation Order. At the end of seven years, the balance due and owing will be paid by a balloon payment. Plans which provide for balloon payments have been approved. *In re Bryson Properties, supra.*

The creditors holding unsecured claims have accepted the plan. The plan meets the "best interest" of creditors' test under § 1129(a)(7)(A)(ii) in that unsecured claims will receive more under the plan than in liquidation. The liquidation analysis demonstrates that there would be no funds available for distribution to unsecured claims in the event of liquidation.

Since all classes of unsecured claims have accepted the plan, "cram-down" as to these classes is not required, thereby foregoing any discussion of the "absolute priority rule" and the "new value exception". The absolute priority rule is not applicable with respect to an impaired class of unsecured claims that has accepted the plan. *In re Club Associates, supra.*

## CONCLUSION

The plan meets all applicable requirements of § 1129(a), does not discriminate unfairly, and is fair and equitable as to dissenting classes. Accordingly, a separate order confirming the plan will be entered.