**CONTINENTAL BANK, N.A.,**
**Plaintiff–Appellee,**

v.

**Robinson O. EVERETT, et al.,**
**Defendants–Appellants.**

**No. 91–2979.**

United States Court of Appeals,
Seventh Circuit.

Argued April 13, 1992.

Decided May 21, 1992.

Rehearing Denied Aug. 12, 1992.

Lynn D. Thesing, Howard J. Roin (argued), Andrew S. Marovitz, Mayer, Brown & Platt, Chicago, Ill., for plaintiff-appellee.

Jeffrey C. Blumenthal, Todd R. Mendel, James R. Figliulo, Robert E. Wiss, Patrick R. Gabrione, Foran & Schultz, Chicago, Ill., Robinson Oscar Everett (argued), Everett, Gaskins, Hancock & Stevens, Durham, N.C., for defendant-appellant Robinson Everett.

Jeffrey C. Blumenthal, James R. Figliulo, Robert E. Wiss, Patrick R. Gabrione, Foran & Schultz, Michael J. Kralovec, William H. Hrabak, Jr., Ronald J. Guild, Feiwell, Gal-

per & Lasky, Chicago, Ill., for defendant-appellant J.H. Froelich.

Before CUDAHY, EASTERBROOK and KANNE, Circuit Judges.

EASTERBROOK, Circuit Judge.

Guilford Telecasters, Inc., which operates WGGT–TV in Greensboro, North Carolina, borrowed $4.2 million from Continental Bank in 1984. Continental obtained guarantees from the firm's stockholders, each of whom is jointly and severally liable up to a limit based on his proportional ownership of the stock. Robinson Everett and the estate of Kathrine Everett, his mother, own 65% of the stock between them. Each guaranteed roughly $1.6 million of Guilford's debt. J.H. Froelich, who owns a smaller bloc, guaranteed about $545,000 of the debt. Other investors assumed proportional obligations.

Guilford encountered cash flow problems and in 1986 filed a bankruptcy petition. Continental, which had a security interest in Guilford's receivables, consented to their use in operating the business, if Guilford remained current on the loan—which it did, until May 1987. Then the guarantors took over, in order to fulfill the condition on which Guilford had access to cash. During 1989 the guarantors and Continental reached a pass over two topics. First, Continental insisted that the guarantors pay according to the schedule negotiated before the bankruptcy, under which the payments increase with time to retire additional principal. The guarantors insisted that they had to pay only the amount due each month when the bankruptcy began. Second, Continental as creditor voted against the plan of reorganization proposed by the debtor and supported by the guarantors in their roles as its investors and managers. (Robinson Everett, a professor of law who was at the time the Chief Judge of the United States Court of Military Appeals, was not a manager of the TV station but took an active role as an investor.) At the beginning of 1990 the guarantors stopped paying. Continental responded with this diversity action. All guarantors except Froelich and the two Everetts paid up.

From now on, we refer to these three collectively as "the guarantors."

Initially the guarantors attempted to persuade the district judge that the court lacked personal jurisdiction over them. The judge disagreed, holding that by guaranteeing a loan with a Chicago bank, promising to pay in Illinois, agreeing that any dispute would be resolved under the law of Illinois, and so on, the defendants were doing business in Illinois for purposes of Ill.Rev.Stat. ch. 110 ¶ 2–209(a)(1). 742 F.Supp. 508 (N.D.Ill.1990). Next the court granted summary judgment for the Bank, 760 F.Supp. 713 (1991), and finally determined the sums remaining to be paid on the guarantees, 768 F.Supp. 246 (1991). Meanwhile the bankruptcy judge confirmed Guilford's plan of reorganization, cramming the plan down an objecting Continental's throat after finding that the Bank would be paid in full. *In re Guilford Telecasters, Inc.*, 128 B.R. 622 (Bankr.M.D.N.C.1991). Guilford has since paid principal and interest—but not in full. It did not pay the penalty interest that the Bank has claimed from the guarantors on account of the default in January 1990. This sum of approximately $75,000, plus the legal fees the Bank has incurred pursuing the guarantors, are the remaining stakes.

Appellate jurisdiction is the first topic. The guarantees entitle the Bank to recover the attorneys' fees incurred in the course of collection. The fees are substantial, exceeding $400,000, as the guarantors have fired off a fusillade of defenses. The district court entered judgment on the guarantees but put off determining the precise amount payable as fees. An open issue about legal fees, contractual or otherwise, does not affect our jurisdiction to resolve the appeal on the guarantees of the principal and interest. *Budinich v. Becton Dickinson & Co.*, 486 U.S. 196, 108 S.Ct. 1717, 100 L.Ed.2d 178 (1988) (merits and fees appealable separately); *Buggs v. Elgin, Joliet & Eastern Ry.*, 852 F.2d 318, 321 n. 3 (7th Cir.1988) (failure to quantify award of fees does not prevent appeal on the merits); *Exchange National Bank v. Daniels*, 763 F.2d 286 (7th Cir.1985) (fees

due under contract and those required by law are treated the same for purposes of appellate jurisdiction). Contra, *Justine Realty Co. v. American National Can Co.*, 945 F.2d 1044 (8th Cir.1991) (when fees are provided by contract, judgment on the merits is not appealable until fees have been quantified).

■ Next comes personal jurisdiction. The district court concluded that the entire course of dealings amounted to "transaction of any business within" Illinois. Ill. Rev.Stat. ch. 110 ¶ 2–209(a)(1). Whether the court's understanding of "business" is correct does not matter. Late in 1989, before the Bank commenced this suit, Illinois amended its long-arm statute to assert personal jurisdiction over those who participate in "[t]he making or performance of any contract or promise substantially connected with this State", ¶ 2–209(a)(7). The loan and guarantees are "substantially connected with" Illinois—the documents recite that they were delivered and executed in Illinois, the loan was to be repaid in Illinois, and the guarantors agreed that Illinois law would govern. These same considerations show that personal jurisdiction is consistent with the due process clause of the fourteenth amendment. *Heritage House Restaurants, Inc. v. Continental Funding Group, Inc.*, 906 F.2d 276, 283–84 (7th Cir. 1990); *Madison Consulting Group v. South Carolina*, 752 F.2d 1193 (7th Cir. 1985); *O'Hare International Bank v. Hampton*, 437 F.2d 1173 (7th Cir.1971).

■ On to the merits. All of the guarantors' defenses (and mirror-image counterclaims) are variations on the theme that the Bank left the loan undersecured, exposing the guarantors to more risk than they anticipated. Continental's obligation to Guilford was contingent on Guilford's providing the Bank with security interests in, among other things, its broadcasting license and its leased broadcasting facilities. Continental funded the loan without obtaining a security interest in the license, having concluded that such an interest is legally impossible. And although Guilford took the steps necessary to grant a security interest in its leaseholds, the Bank failed to perfect that interest. The Bank obtained an interest in Guilford's receivables and other assets, but the guarantors say this is insufficient, that the Bank's taking the full security was essential for their protection. They add that the Bank defrauded them by not revealing what it knew and they did not: that because a broadcast license is not property, 47 U.S.C. § 301, and may not be assigned or transferred without the FCC's permission, 47 U.S.C. § 310(d), the license itself is not a store of value on which the Bank could levy. *Stephens Industries, Inc. v. McClung*, 789 F.2d 386, 390–91 (6th Cir.1986); *In re Merkley*, 94 F.C.C.2d 829 (1983). Cf. R.H. Coase, *The Federal Communications Commission*, 2 J.L. & Econ. 1, 25–40 (1959).

Although the guarantors argue that the Bank defrauded them, that effective security was a condition precedent to the effectiveness of the loan and guarantees, and that the Bank impaired the value of the collateral, these amount to the same thing, and we treat the position as one argument. Professor Everett, arguing on behalf of all three guarantors, conceded that he had not found a case in Illinois (or any other jurisdiction) requiring a lender to reveal to a guarantor the value of the borrower's assets as collateral. No surprise. It amounts to saying that a potential debt investor in a firm (which a bank is) owes a duty of care, perhaps even a duty of loyalty, to the existing equity investors (which Guilford's guarantors are) or contingent debt investors (which all guarantors are, given the possibility of subrogation, see *Levit v. Ingersoll Rand Financial Corp.*, 874 F.2d 1186, 1194–97 (7th Cir.1989)). That is unheard-of in either corporate or banking law. A bank making a commercial loan depends largely on the success of the business for repayment. The firm has the best information about its business and prospects and accordingly may be obliged to disclose some details to the bank and the guarantors. Even that duty is attenuated, for persons negotiating for a contract usually may keep valuable information to themselves. They may not lie, but they need not volunteer. The ability to capitalize on private information is an important

goad to create that knowledge, which may be important in matching assets with their most productive use. See generally E. Allan Farnsworth, 1 *Contracts* § 4.11 at 406–10 (1990), and Anthony T. Kronman, *Mistake, Disclosure, Information, and the Law of Contracts,* 7 J. Legal Stud. 1 (1978), both of whom collect and analyze the cases. Banks' self-interest leads them to nose out the value of collateral; if they do not, they are apt to suffer loss. Borrowers and guarantors have their own reasons to know the value of the assets. None acts as fiduciary of another. *Farmer City State Bank v. Guingrich,* 139 Ill. App.3d 416, 423, 94 Ill.Dec. 1, 6, 487 N.E.2d 758, 763 (4th Dist.1985).

The general principle that parties to arms' length negotiations need not open their files to each other is especially apt here, because the bit of information the guarantors wanted Continental to reveal—that it could not obtain a security interest in a broadcast license—is both public and irrelevant. It is public because it is a legal conclusion, having nothing to do with facts peculiar to WGGT–TV or information buried in Continental's vaults. One side in negotiations need not disclose the United States Code to the other; the statutes, regulations, and cases are available to all. Like other states, Illinois takes the position that failure to disclose the law cannot be the foundation for redress. E.g., *Aurora v. Green,* 126 Ill.App.3d 684, 688, 81 Ill. Dec. 739, 742, 467 N.E.2d 610, 613 (2d Dist.1984); *Hamming v. Murphy,* 83 Ill. App.3d 1130, 1135, 39 Ill.Dec. 435, 439, 404 N.E.2d 1026, 1030 (2d Dist.1980). So, too, Illinois expects guarantors to inquire into risks. *St. Charles National Bank v. Ford,* 39 Ill.App.3d 291, 295, 349 N.E.2d 430, 434 (2d Dist.1976). If Guilford and the guarantors wanted to know whether a broadcast license may be used as collateral, they had only to ask their own lawyer. *McLean County Bank v. Brokaw,* 119 Ill.2d 405, 417, 116 Ill.Dec. 561, 566, 519 N.E.2d 453, 458 (1988). Not surprisingly, they had counsel to advise them about the intricacies of communications law. If as the guarantors now say the use of a license as collateral is a debatable issue, so that

their lawyer's views were unreliable, it is all the more reason why Continental cannot be accused of "fraud" for failing to "reveal," as if it were a fact, its view of the law. But the whole subject is irrelevant. A broadcast license is not a tangible asset. It can't be melted down, sold as scrap, or packed up and sent to Alaska. Its value lies in access to a given frequency in a specific place, which yields time that may be sold by the minute to advertisers. The value of the license to Guilford lay in the income stream from those advertisers. Continental wanted, and got, a security interest in that income, which it could enjoy while Guilford remained the owner of the license and operator of WGGT–TV. What more would it have had with a security interest in the license? An ability to sell the license to someone able to extract greater revenues is not much different from the ability to replace Guilford's managers in the bankruptcy. This makes it hard to see how the Bank's failure to reveal 47 U.S.C. § 301 to the guarantors did them injury.

In the end the parties' rights are fixed by their contracts, which contain three dispositive provisions. First, they say that the security is for the benefit of the lender, not of the borrower or guarantors. Second, they provide that the "Bank shall have no duty as to the collection or protection of the Collateral or any part thereof or any income thereon, or as to the preservation of any rights pertaining thereto, beyond the safe custody of any Collateral actually in the Bank's possession." Third, the guarantors "expressly waive[ ] . . . all diligence in collection or protection of or realization upon . . . any security for" the loan to Guilford, and permit the Bank to "release . . . any property securing" the loan without notice to them. It could hardly be clearer that the lender is free to do what it wants with the collateral. 760 F.Supp. at 719. Illinois enforces clauses of this kind, which are fatal to the guarantors' position. *Lawndale Steel Co. v. Appel,* 98 Ill.App.3d 167, 172, 53 Ill.Dec. 288, 292, 423 N.E.2d 957, 961 (2d Dist.1981); *Ishak v. Elgin National Bank,* 48 Ill.App.3d 614, 617–18,

6 Ill.Dec. 630, 632–33, 363 N.E.2d 159, 161–62 (2d Dist.1977); see also *FDIC v. Nanula,* 898 F.2d 545, 550 (7th Cir.1990) (Illinois law). Guarantors may elect to rely on the lender's attention to its own interests as their best protection, preferring market incentives over legal remedies and receiving lower interest rates in exchange.

The guarantors rely on cases such as *Langeveld v. L.R.Z.H. Corp.,* 74 N.J. 45, 376 A.2d 931 (1977), and *First Citizens Bank & Trust Co. v. Sherman's Estate,* 250 App.Div. 339, 294 N.Y.S. 131 (1937), in which the contracts were silent, and the courts concluded that in the absence of agreement the bank had to maximize its realization on the collateral to reduce the guarantors' risk. Judicial attempts to draft standby terms that will govern when the parties neglect to address the subject are just guesses about what the parties would prefer. When the contracting parties draw up their own provisions, courts enforce them. People write things down in order to assign duties and allocate risks—functions vital to economic life yet defeated if courts prefer hypothetical bargains over real ones or use the ambiguities present in all language to frustrate the achievement of certainty. Cf. *Concast, Inc. v. AMCA Systems, Inc.,* 959 F.2d 631 (7th Cir.1992).

What about the requirement of good faith that is part of every contract? The guarantors say that they are entitled to a jury trial to determine whether the Bank acted throughout in good faith. Once again, the guarantors misunderstand how courts use such principles. The Uniform Commercial Code defines good faith as honesty in fact. UCC § 1–201(19). See also 2 *Farnsworth on Contracts* at § 7.17a; Robert S. Summers, *"Good Faith" in General Contract Law and the Sales Provisions of the Uniform Commercial Code,* 54 Va.L.Rev. 195 (1968). Beyond that, and the obligation to be prudent in the exercise of discretion conferred by contract, see *Capital Options Investments, Inc. v. Goldberg Brothers Commodities, Inc.,* 958 F.2d 186, 189 (7th Cir. 1992) (Illinois law), good faith is another way to describe the effort to devise terms to fill contractual gaps. *Market Street*

*Associates Limited Partnership v. Frey,* 941 F.2d 588, 595 (7th Cir.1991); *Jordan v. Duff & Phelps, Inc.,* 815 F.2d 429, 435–36, 438–39 (7th Cir.1987) (Illinois law); *Tymshare, Inc. v. Covell,* 727 F.2d 1145, 1152 (D.C.Cir.1984). As a method to fill gaps, it has little to do with the formation of contracts (a point *Frey* stresses, 941 F.2d at 595, but that the guarantors, despite their heavy reliance on *Frey,* ignore) and nothing to do with the enforcement of terms actually negotiated. Because this duty is an estimate of "what parties would agree to if they dickered about the subject explicitly, parties may contract with greater specificity for other arrangements." *Jordan,* 815 F.2d at 436. Our guarantors negotiated with the Bank and agreed to language establishing precisely what duties Continental would have with respect to security: it must safeguard collateral in its possession but has no other obligations. Gap-filling methods such as good faith do not "block use of terms that actually appear in the contract". *Kham & Nate's Shoes No. 2, Inc. v. First Bank of Whiting,* 908 F.2d 1351, 1357 (7th Cir.1990). Accord, *Capital Options,* 958 F.2d at 190–91. The guarantors released Continental from any obligation to use the collateral for *their* benefit. The guarantors may rue their decision but cannot escape it.

■ At last to the remedy. The parties debated in the district court how to determine the maximum obligation of each guarantor. Under the contracts, payments were to be credited against the caps but interest was to be deducted. Continental and the guarantors contested how to account for the simultaneous payments and running of interest between May 1987 and December 1989. None of this matters any more, for both the penalty interest and liability for attorneys' fees come on top of the cap.

Over the guarantors' protest, the district court declined to determine the amount of Guilford's outstanding liability, observing that because that liability exceeded any of the three guarantors' obligations, the precise figures did not matter. Time has overtaken this assessment. The bankruptcy

judge in North Carolina determined the amount Guilford owed. 128 B.R. at 628. Because the district court must now determine the sum due as attorneys' fees, it is prudent for the court simultaneously to fix the amount of penalty interest and enter a single judgment, on which the guarantors will be jointly and severally liable. We remand the case for that purpose.

Only the amount of fees and penalty interest remains in contention. The district court held, 768 F.Supp. at 247 n. 4, that penalty interest is due from January 1, 1990, when the defendants dishonored their guarantees. The guarantors did not present this as an issue on appeal separate from their main argument that they owe nothing. Any additional arguments they may have, they have waived. And it should go without saying that the computation of legal fees and costs is not an occasion to reopen any of the substantive issues that we have resolved, or passed in silence as requiring no separate discussion.

AFFIRMED AND REMANDED