**In re PIECE GOODS SHOPS COMPANY, L.P., Piece Goods Shops Corp., Debtors.**

**Bankruptcy Nos. B–93–11261 C–11W, B–93–11262 C–11W.**

United States Bankruptcy Court, M.D. North Carolina, Winston–Salem Division.

Oct. 6, 1995.

William B. Sullivan and Rory D. Whelehan, for Debtors.

Richard M. Hutson, II, for the Committee.

Marcia L. Goldstein, for The Prudential Insurance Company of America and Pruco Life Insurance Company.

David S. Walls, for NationsBank.

## MEMORANDUM OPINION

JAMES B. WOLFE, Jr., Bankruptcy Judge.

Piece Goods Shops Company, L.P., a North Carolina limited partnership which owns and operates a chain of retail stores specializing in fabrics, crafts, and related merchandise, and its general partner, Piece Goods Shops Corp., each filed voluntary chapter 11 petitions on April 19, 1993. The cases were administratively consolidated by order entered on May 12, 1993. Piece Goods Shops Company, L.P. (the "Partnership Debtor") and Piece Goods Shops Corp. (the "General Partner Debtor") (collectively, the "Debtors"), together with the Official Committee of Unsecured Creditors (the "Committee"), filed a Joint Plan of Reorganization and a Joint Disclosure Statement on June 22, 1995. The Committee consists of several different types of unsecured creditors, including the co-chairman, Prudential Life Insurance Company of America ("Prudential") which, together with its affiliate Pruco Life Insurance Company, was a lender to the Debtors and holds the largest unsecured claim in the amount of $61,500,000; the other co-chairman, Butterick Pattern Company, and two other pattern suppliers, Simplicity Pattern Company and McCall's Pattern Company; NationsBank, N.A. (Carolinas) ("NationsBank"), which holds the second largest unsecured claim in the amount of $9,000,000 and which, like Prudential, was a

lender to the Debtors; a fabric vendor, Springs Industries; and a factor, Bank of New York.

Of the approximately 1100 creditors in the cases, the only one to object to the Joint Disclosure Statement was NationsBank. The Debtors and the Committee made a number of modifications and additional disclosures to address NationsBank's objections. On July 20, 1995, the proponents filed a Modified Joint Plan of Reorganization (the "Plan") and Modified Joint Disclosure Statement (the "Disclosure Statement"). On the same day the Court approved the Disclosure Statement under Section 1125 of the Bankruptcy Code.

The deadline for filing objections to confirmation of the Plan was August 15, 1995. Two creditors, NationsBank and a landlord for one of the Debtors' stores, filed timely objections to confirmation. The landlord's objection was resolved by consent order. NationsBank filed two objections to confirmation within the August 15, 1995 deadline—a "preliminary" objection and a detailed, thirty-three page objection. Thereafter, on August 18, 1995, NationsBank filed a document styled "Objection of NationsBank, N.A. (Carolinas) to Summary of Balloting and Inclusion of Prudential Life Insurance Company of America in Class 9 for Determining Acceptance of the Plan" which the proponents contend is a late-filed additional objection to confirmation.

The confirmation hearing was originally scheduled to commence on August 22, 1995, but was continued to August 28, 1995. In the interim, an unsuccessful effort was made to mediate NationsBank's objections to confirmation. The confirmation hearing was conducted on August 28, September 5 and 6, 1995. Extensive evidence was presented on behalf of the Plan proponents and NationsBank, including documentary evidence and testimony from eight witnesses.

At the conclusion of the hearing, the Court ruled from the bench that the Debtors and the Committee had satisfied the requirements for confirmation under Section 1129, overruled NationsBank's objection, and confirmed the Plan. A written order confirming the Plan was entered on September 7, 1995.

Thereafter, NationsBank moved for relief from the confirmation order and for an extension of time to file an appeal. By consent order entered September 26, 1995, NationsBank's motions were denied with prejudice.

This opinion shall constitute the Court's findings of fact and conclusions of law in connection with the order confirming the Plan.

## HISTORY

The Debtors commenced business with the opening of their first retail store in 1935 and enjoyed growth in stores, sales, and profitability until 1992 when the fabric industry fell into a recession and the Debtors encountered difficulty in servicing debt obligations incurred in connection with a leveraged buyout in 1989. By the petition date in April 1993, the Debtors' retail chain had grown to 318 stores operating in 20 states.

While operating in chapter 11, the Debtors have undergone significant changes and restructuring. A new management team is running the business. Effective January 1, 1995, the Court granted a motion filed by the Debtors and supported by the Committee to employ Mr. Gregory F. Rayburn as the Debtors' new Chairman and Chief Executive Officer. Mr. Rayburn is a CPA with extensive experience in advising retail and other businesses in chapter 11 proceedings. Previous to his employment by the Debtors, Mr. Rayburn had been a partner with Arthur Andersen, LLP ("Arthur Andersen") and had been in charge of the firm's representation as financial and business advisors to the Committee and the Debtors. His role as advisor to the Committee and the Debtors was filed by another Arthur Andersen partner, Mr. Richard Holmes. Other senior management changes during the reorganization, all of which were approved by the Court, include the employment of a new chief financial officer and a new merchandising director with particular experience in crafts. Mid-level management changes include a new fabrics buyer, new crafts buyer, human resources director, and tax manager.

Unprofitable stores have been identified and closed, reducing by about one-third the

size of the Debtors' retail chain. In connection with the store closings, the Debtors conducted several Court authorized going-out-of-business sales ("GOB sales") which converted excess inventory to cash. At the conclusion of the GOB sales and following unsuccessful efforts to market the leases of the closed stores through assumption and assignment under Section 365 of the Bankruptcy Code, the Debtors rejected the leases in order to limit administrative rent claims.

The Debtors, with Arthur Andersen's assistance, have developed and implemented a new home center store (the "Home Center") which differs from the Debtors' traditional base store. The base store is typically 5000 square feet in size and focuses on selling apparel, fabrics, sewing patterns, notions and some crafts. A typical Home Center is approximately twice as large, with base store merchandise displayed in the middle to attract traditional customers and surrounded by "boutiques" of home decorating merchandise, upholstery fabrics, and basic furniture pieces, and with access to a home decorator, all designed to attract new customers. The Debtors opened their first Home Center in June 1994 and currently operate about 34 Home Centers. Sales and profits per square foot of floor space have proved to be significantly greater for Home Centers than for base stores.

Other changes made since the petition date include (i) obtaining a $30,000,000 post-petition financing facility from The CIT Group/Business Credit, Inc. ("CIT"), which requires, among other things, that the Debtors' earnings satisfy certain minimum "EBITDA" [1] criteria, (ii) improving craft purchases and sales, (iii) acquiring point of sale registers for 30 stores which has increased management information, (iv) reducing overhead by reducing executive compensation, eliminating unfunded life insurance benefits, and ceasing to pay time-and-a-half compensation for work on Sundays, (v) improving inventory controls, and (vi) curtailing price discounting to improve margins.

1. "EBITDA" is an accounting acronym which stands for "Earnings Before Income, Taxes, De-

## THE PLAN

The Plan was jointly developed and proposed by the Debtors and the Committee. The Committee created a plan subcommittee whose members were Mr. Anthony Torre of Prudential, Mr. Sam McNeil of NationsBank, and Mr. Frank Rizzo of Simplicity Pattern Company. Term sheets were exchanged and meetings were held to negotiate the provisions of the Plan.

An important issue during negotiations was whether the Plan should provide that general unsecured creditors receive for their claims all of the equity in the reorganized company or whether, instead, they should receive a combination of equity and debt. The Debtors wanted an all equity plan. Mr. Holmes, the Arthur Andersen partner in charge of advising the Committee and the Debtors, also advocated an all equity plan. Prudential and NationsBank initially favored some debt, although there were differences over whether the debt should require cash payment of interest or provide for "PIK" interest, i.e., payment-in-kind interest. Initially, the Committee voted preliminarily in favor of PIK debt, subject however to a determination that the PIK interest was not taxable. After it became apparent that the PIK interest would likely be taxed, the final vote of the Committee was 6 to 1 in favor of an all equity plan. The lone dissenter was NationsBank.

Other important issues negotiated as part of the Plan were the release of subordination claims and avoidance actions, Prudential's agreeing to give up its right as the majority stockholder to elect all members of the new Board of Directors (the "Board") so that management and the other creditors would be assured representation on the Board, a "drag along" provision which requires that if an offer is made to purchase all of the new stock issued under the Plan, each holder must sell its shares if the offer is approved by holders of a majority of the shares (Prudential will hold a majority upon the Effective Date of the Plan) and the Board approves the offer as being in the best interests

preciation and Amortization."

of the holders, and the granting to management of retention bonus and stock option rights.

■ The Plan provides for substantive consolidation of the Debtors. The effect is to eliminate inter-Debtor claims and cross guaranties and to eliminate duplicative claims by creditors of the Partnership Debtor who also filed claims against the General Partner Debtor based on its liability as general partner for the obligations of the partnership. Substantive consolidation results in a pooling of the assets and liabilities of the two bankruptcy estates. In these cases, the General Partner Debtor has no material asset other than its equity interest in the Partnership Debtor, and all claims against the General Partner Debtor, except the claim of the Internal Revenue Service ("IRS"), are based on its derivative liability as general partner for the debts of the Partnership. The IRS has filed a proof of claim in the General Partner Debtor's case, but not in the Partnership Debtor's case. In the absence of substantive consolidation, the IRS may nevertheless have been able to recover from the Partnership Debtor's estate because the Partnership Debtor routinely transferred funds to the General Partner Debtor to pay taxes to the IRS and because tax refunds, including a $1,700,000 refund during the reorganization cases, were paid by the IRS to the General Partner Debtor which thereafter transferred them to the Partnership Debtor. Substantive consolidation gives the IRS an unquestioned claim against the assets of the Partnership. The Court finds that any negative impact on creditors holding claims against the Partnership Debtor by having the IRS claim added to the pooled assets and liabilities is offset by the benefit of substantive consolidation in preserving the partnership structure and net operating losses totalling approximately $18,000,000, which losses may be used against future earnings to reduce future tax liability. No creditor or other party in interest, including NationsBank, raised a timely objection to the Plan's provision for substantive consolidation.

The Plan contemplates substantial reinvestment of capital in the business, primarily to continue conversions of base stores into Home Centers and to acquire better management information systems. The Debtors have a commitment letter from Heller Financial for a $20,000,000 exit financing facility which is needed to effectuate the Plan. The effective date of the Plan is the later of October 31, 1995, or the last day of the calendar month in which the exit financing facility becomes available to the reorganized Debtors. The Plan provides that the final terms and conditions of the facility shall be submitted to the Court for approval upon notice and hearing.

The Plan classifies all claims and interests into eleven (11) separate classes. Classes 1, 2, 3, 4, 5, 6, 7B, 8, and 10 are not impaired. Those classes provide for the treatment of administrative expenses, including CIT's administrative claim and reclamation claims; wage and benefit claims; tax claims; the claim of The Independent Order of Forresters secured by a deed of trust on the Debtors' warehouse and distribution center; unsecured claims of $200 or less; certain long-term standing debit claims of pattern suppliers, and the interests of the General Partner Debtor and its wholly owned subsidiary, PG–Sub, Inc., as partners of the Partnership Debtor. NationsBank's objections to confirmation do not concern these unimpaired classes, and the Court finds that they satisfy the requirements of Section 1129 of the Bankruptcy Code.

The impaired classes are, as follows:

1. *Class 7A.* This class covers convenience claims greater than $200 and less than $2,500 in amount. The treatment proposed for each holder of an allowed claim in Class 7A is payment in cash of the greater of $200 or fifty percent (50%) of the allowed amount of the claim. Utilities which fall into this class are required to apply against their claims any post-petition deposits which they received in accordance with Section 366 and to refund the balance, if any.

2. *Class 9.* This is the class which treats the claims of all general unsecured creditors other than those covered by the convenience classes. It provides that each holder of an allowed claim in Class 9 shall receive in full satisfaction thereof one (1) share of new common stock (the "New Common Stock") in the

reorganized General Partner Debtor (hereinafter the "Reorganized Company") for each one hundred dollars ($100) of the allowed claim amount. The Plan does not provide for fractional shares to be issued. In distributing shares of stock to Class 9 creditors, all enforceable, contractual subordination agreements between creditors will be honored, including Prudential's agreement to subordinate a portion of its claim to that of NationsBank.

■ 3. *Class 11.* Class 11 covers all of the common and preferred stock in the General Partner Debtor and proposes that all such interests be terminated, cancelled, and extinguished. Because the General Partner Debtor's existing stockholders are to receive nothing for those interests under the Plan, Class 11 is deemed to have rejected the Plan under Section 1126(g) of the Bankruptcy Code.

## CONFIRMATION REQUIREMENTS

■ A chapter 11 plan shall be confirmed only (i) if it meets each of the requirements set forth in Section 1129(a) or (ii) if Section 1129(a) is satisfied in all respects except for subparagraph (8) which provides that each impaired class must accept the plan and the Court determines, under the "cram down" provisions of Section 1129(b), that the plan does not discriminate unfairly and that its treatment of each rejecting class is fair and equitable. *In re Guilford Telecasters, Inc.,* 128 B.R. 622, 625–26 (Bankr.M.D.N.C.1991). The burden of proof as to confirmation rests on the Debtors and Committee as proponents of the Plan. *In re Locke Mill Partners,* 178 B.R. 697, 700 (Bankr.M.D.N.C.1995).

■ The Court finds that the Plan satisfies each of the applicable confirmation requirements of Section 1129(a), except for subparagraph (8) insofar as the impaired class of interests in Class 11 is deemed to have rejected the Plan. With respect to Class 11, the Court finds that the Plan does not discriminate unfairly and is fair and equitable within the meaning of Section 1129(b). *See In re Guilford Telecasters, Inc.,* 128 B.R. 622, 627 (Bankr.M.D.N.C.1991).

Certain subparagraphs of Section 1129(a) do not apply to these cases, including Section 1129(a)(6) dealing with government rate regulation and Section 1129(a)(13) dealing with retiree benefits within the meaning of Section 1114. Other subparagraphs are satisfied without objection by NationsBank. These include that the proponents of the Plan comply with the applicable provisions of title 11 (Section 1129(a)(2)); that the Court approve as reasonable any payments made or promised by the Debtors, the Committee, or by a person issuing securities or acquiring property under the Plan for services or costs and expenses relating to these cases or to the Plan (Section 1129(a)(4)); that the officers and directors of the Reorganized Company and the affiliates of the Debtors participating in a joint plan have been disclosed, that the appointment of the officers and directors is consistent with the interests of creditors, equity holders, and public policy, and that insiders proposed to be employed or retained by the reorganized Debtors and the nature of their compensation have been disclosed (Section 1129(a)(5)); that the Plan proposes appropriate treatment of priority claims (Section 1129(a)(9)); and that all fees payable under section 1930 of title 28 have been paid or will be paid by the effective date of the Plan (Section 1129(a)(12)).

## NATIONSBANK'S OBJECTIONS

NationsBank contends that the Plan violates Section 1122(a) by including Prudential's claims in Class 9 with the claims of NationsBank and other general unsecured creditors and violates Section 1122(b) by proposing a second convenience class in Class 7B. Although not couched as such, these are objections to confirmation under Section 1129(a)(1) which requires that the Plan comply with the provisions of title 11. NationsBank also objects that the Plan violates Section 1123(a)(4) by not providing "equal treatment" of claims and therefore fails to satisfy the confirmation requirement of Section 1129(a)(1). NationsBank objects that the Plan has not been proposed in "good faith" as required by Section 1129(a)(3) because unsecured claims will not receive debt obligations in addition to all of the New Common Stock in the Reorganized Company. Finally,

NationsBank objects that Section 1129(a)(7) has not been satisfied because the Plan fails the "best interests" of creditors test and because Prudential will control the Board of Directors of the Reorganized Company.

■ Even though NationsBank did not file a timely objection to confirmation on the ground that no impaired class, excluding insiders, has accepted the Plan as required by Section 1129(a)(10) or on the ground that the Plan is not "feasible" as required by Section 1129(a)(10), it argued both issues at the confirmation hearing. Moreover, NationsBank filed an objection after the August 15 deadline alleging that Prudential is an "insider" whose vote should not be counted for purposes of Section 1129(a)(10). The proponents carry the burden of proof with respect to confirmation. Accordingly, the Court will detail its findings that the Plan meets the requirements of Section 1129(a)(10) and Section 1129(a)(11).

## CLASSIFICATION OF CLAIMS

■ The Plan appropriately includes all general unsecured claims [2] in a single class—Class 9. Section 1122(a) authorizes the proponents of a plan to place claims in the same class if they are "substantially similar." The similarity of claims is not judged, as NationsBank contends, by comparing creditor claims *inter se.* Rather, the issue is whether the claims in a class have the same or similar legal status in relation to the debtor. *E.g., In re AOV Industries, Inc.,* 792 F.2d 1140, 1150 (D.C.Cir.1986). Unsecured claims, whether trade, tort, unsecured notes, or deficiency claims of secured creditors, are generally included in a single class because they are "of equal rank entitled to share pro rata in values remaining after payment of secured and priority claims." *FGH Realty Credit Corp. v. Newark Airport/Hotel Limited Partnership,* 155 B.R. 93 (D.N.J.1993).

■ Prudential's claim based upon its unsecured promissory notes is "substantially similar" to the claims of NationsBank, trade creditors, factors, landlords with lease rejection claims, utilities, and other unsecured creditors included in Class 9. All such claims have the same legal status in relation to the Debtors and are of equal rank entitled to share pro rata in the values remaining after payment of secured and priority claims. It matters not that Prudential's notes provide for payment of interest (NationsBank's claim is also based upon an interest bearing debt instrument), that Prudential's unsecured claim arises from its financing in 1989 of a leveraged buyout of the Debtors, that Prudential also is the holder of preferred stock and class B common stock (all of which stock is extinguished under the Plan), or that Prudential agreed to subordinate a portion of its unsecured claim to the unsecured claims of NationsBank. These factors do not place Prudential's unsecured claim in a rank or status different from other unsecured claims vis-a-vis the Debtors. Plan proponents are to be given considerable discretion in classifying claims according to the facts and circumstances of their cases. *In re Holywell Corp.,* 913 F.2d 873, 880 (11th Cir.1990). Here the Debtors and the Committee were within their discretion in deciding to include Prudential's unsecured claim with the unsecured claims of other creditors in Class 9.

■ NationsBank's other objection relating to claims classification concerns the creation of Class 7A, a second convenience class for claims greater than $200 and less than $2,500. NationsBank first argues that by its terms Section 1122(b) prohibits a plan from having more than one convenience class. The statute contains no such prohibition. The same argument was rejected by the court in *In re Jartran,* 44 B.R. 331 (Bankr. N.D.Ill.1984). In that case, the court approved two convenience classes, one providing for payment in full on the effective date of all claims less than $500 and the other providing for stretched out payments of all claims between $500 and $2500.

■ The issue under Section 1122(b) is not the number of convenience classes, but whether Class 7A is reasonable and necessary for administrative convenience. Mr. Rayburn testified that the reason for creating Class 7A was to reduce the number of creditors who receive New Common Stock

---

**2.** Excluding general unsecured claims in the convenience classes.

below 500 so that the stock would not have to be publicly registered. Based upon his experience in working for public companies, Mr. Rayburn knew of the costs involved in being subject to securities regulations, including the filing of 10–K and 10–Q reports, and desired for the reorganized Debtors to avoid those costs. There is no evidence to support NationsBank's contention that Class 7A was designed to avoid the scrutiny of federal regulators. Nor is there any evidence to support NationsBank's contention that Class 7A was intended by the Plan proponents to gerrymander voting and create an impaired accepting class. Of the approximately 1100 unsecured claims in these cases, the convenience classes cover about 800, leaving 300 larger unsecured claims for treatment with equity distribution under Class 9. Thus, the convenience classes serve the purpose of allowing the reorganized Debtors to avoid the trouble and expense of complying with public registration requirements. Moreover, Mr. Rayburn estimated that the Debtors will pay about $200,000 in satisfaction of all 800 convenience claims, an amount which the Court finds to be reasonable and necessary in the circumstances of these cases.

## EQUAL TREATMENT OF CLAIMS

■ NationsBank contends that the Plan does not provide equal treatment to all creditors in Class 9. The Court disagrees. The Plan provides that each holder of an allowed claim in Class 9 shall receive one share of New Common Stock for each $100.00 of allowed claim. Moreover, as to subordinated claims, the Plan expressly provides that inter-creditor subordination agreements will be enforced, resulting in the allocation of distributions otherwise payable on account of subordinated claims to holders of senior claims, specifically Prudential and NationsBank. As a result of the *pro rata* equity distribution under the Plan and after giving effect to the subordination provisions described above, Prudential will hold approximately 54 percent, or a majority, of the New Common Stock in the Reorganized Company.

NationsBank, however, argues that the effect of the so-called "drag-along" and release provisions under the Plan is to yield additional value for Prudential alone. The "drag-along" provision is at Article IV, Section 4.1(e) of the Plan, entitled "Offer to Purchase All Stock under the Plan." It is not part of the treatment of claims, but rather, a negotiated corporate governance provision which will be included in the Reorganized Company's certificate of incorporation. It requires all shareholders to sell their common stock in an offer received and approved by a holder of the majority of the Reorganized Company's common stock and the board of directors of the Reorganized Company.

■ Articles IV and XIII of the Plan, entitled "Provisions of Equity Securities To Be Issued Pursuant to the Plan" and "Officers and Directors of Reorganized Company," respectively, contain numerous corporate governance provisions which were negotiated among members of the Committee and the Debtors to achieve the consensus which is the foundation of the jointly proposed Plan. These include, in addition to the so-called drag-along provision, restrictions on Prudential's rights to vote for directors of the Reorganized Company so that other creditors and management are assured of representation. Such provisions are consistent with Section 1123(a)(5) which contemplates "amendment of the debtor's charter" as one of the means of implementing the agreements embodied in a plan.

The corporate governance provisions of Articles IV and XIII of the Plan represent a give and take among Committee members and the Debtors. Absent these provisions, Prudential, as majority shareholder, could control the vote for all five directors of the Reorganized Company. Instead, Prudential has relinquished its voting rights with respect to certain Board seats, assuring non-Prudential shareholders and management four of the five seats during the first year after consummation of the Plan and assuring non-Prudential shareholders one seat thereafter. These provisions, which represent an accommodation by Prudential to the Committee and the Debtors, along with the "drag-along" provision, were included in the Plan as part of the consensus reached on corporate governance.

**790**

Although the corporate governance provisions of the Plan may affect shareholders of the Reorganized Company, they do not change the fact that all Class 9 creditors receive *pro rata* distributions of the stock of the Reorganized Company. In any case where the plan converts unsecured claims to equity and a single creditor's claim represents more than half of the total claims, that creditor will have the benefits of control, *i.e.*, to select directors, approve mergers, etc. However, these special control benefits flow not from "unequal treatment" of claims, but rather from the natural consequences of corporate law. *See, e.g.,* Delaware General Corporation Law § 251(c). Accordingly, non-economic attributes of equity ownership should not be germane to the analysis of equality of treatment under Section 1123(a)(4) of the Bankruptcy Code. Otherwise, it would be impossible to confirm any plan under which a creditor receives a controlling percentage of the stock of a reorganized corporate debtor. It is clear that this is not the case, and at least one court has held that provisions of a plan regarding control or management of the reorganized debtor which affect members of the same class differently are irrelevant to the test for equality of treatment under Section 1123(a)(4) of the Bankruptcy Code. *See Acequia, Inc. v. Clinton (In re Acequia, Inc.),* 787 F.2d 1352 (9th Cir.1986).

NationsBank also argues that Prudential, and no other Class 9 creditor, will benefit from the general compromise, settlement and release of equitable subordination claims under the Plan. The Court, however, does not believe that the release provisions of Article XI of the Plan violate the equality of treatment requirements of Section 1123(a)(4). The Plan provides not only a release of equitable subordination claims, but also a release of preference and other avoidance actions, all of which are equally applicable to all creditors. Prudential is not singled out as a beneficiary. Indeed, in the case of Prudential, both the Debtors and the Committee have made the determination that there is not a sufficient factual or legal basis to pursue any kind of equitable subordination claim. *See* Disclosure Statement at pp. 36–37. NationsBank did not put forth any au-

thority or introduce any evidence or testimony that refuted the conclusions reached by the Debtors and the Committee.

## GOOD FAITH

Section 1129(a)(3) requires that the Plan be proposed in "good faith" and not by any means forbidden by law. The requirement of good faith must be viewed in light of the totality of the circumstances surrounding the establishment of a chapter 11 plan. *In re Block Shim Development Company—Irving,* 939 F.2d 289 (5th Cir.1991). Generally, a plan is proposed in good faith if there is a reasonable likelihood that it will achieve a result consistent with the goals of the Bankruptcy Code. *Hanson v. First Bank of South Dakota, N.A.,* 828 F.2d 1310 (8th Cir.1987). The primary goal of chapter 11 is to promote the restructuring of the debtor's obligations so as to preserve the business and avoid liquidation. *See NLRB v. Bildisco and Bildisco,* 465 U.S. 513, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984) ("The fundamental purpose of reorganization is to prevent a debtor from going into liquidation, with an attendant loss of jobs and possible misuse of economic resources."). The Plan proposed by the Debtors and the Committee accomplishes this goal by providing the means through which the Debtors may continue to operate as a viable entity in the marketplace.

NationsBank objects that the Plan was not proposed in good faith because it fails to include debt repayment to unsecured creditors in Class 9 even though the Debtors' business plan and projections allegedly reflect an ability to repay at least some of the debt over time. The authority relied upon by NationsBank—*In re Walker,* 165 B.R. 994 (E.D.Va.1994)—is inapposite. In *Walker,* the debtors were solvent and proposed a plan which deferred any payment to secured creditors, failed to provide a schedule of asset liquidations which were needed to fund the plan, and permitted the debtors to maintain a lavish lifestyle. By contrast, the Debtors in these cases are insolvent, with a going concern value estimated at $31.5 million (a value which NationsBank maintains is too high) and unsecured liabilities of

approximately $102 million. Further, unlike *Walker*, the Plan does not sacrifice the interests of creditors for the benefit of the Debtors. Rather, the Plan proposes to extinguish the interests of the existing equity holders and give the entire value of the Debtors to the creditors in the form of cash payments to secured, priority and convenience creditors and of distributions of all the New Common Stock to general unsecured creditors in Class 9. Moreover, the fact that the Plan is proposed by the Committee as well as the Debtors is strong evidence that it is proposed in good faith.

■ The position which NationsBank takes in its objection, namely, that the Plan must provide for general unsecured creditors to receive debt obligations in addition to all of the stock in the reorganized Debtors, is the same position which it took during negotiations on the Plan and which was rejected by Prudential and the other five creditors on the Committee, by the professional advisors to the Committee and the Debtors, and by the Debtors. Among the reasons the proponents' witnesses gave for favoring an all equity Plan were to avoid the taxation problem with PIK debt, provide more cash for reinvestment in the business, increase the Debtors' ability to perform the business plan, obtain more vendor and factor support, and enhance the value of the stock. In addition, Mr. Rayburn testified that Heller Financial, which has committed to provide exit financing for the Plan, was unwilling to have those funds used to pay principal or interest on debt owed to unsecured creditors. The Court finds that the Plan was proposed in good faith as required by Section 1129(a)(3), and NationsBank's objection in this regard is overruled.

## BEST INTERESTS TEST

■ To be confirmable, a plan of reorganization must satisfy the "best interests" test under Section 1129(a)(7). *E.g., In re Neff*, 60 B.R. 448, 452 (Bankr.N.D.Tex.1985), *aff'd*, 785 F.2d 1033 (5th Cir.1986). The best interests test requires that each holder of a claim or interest in an impaired class accept the plan or, alternatively, receive or retain under the plan property having a present value at least equal to what the holder would receive or retain if the debtor were liquidated under chapter 7 on the effective date of the plan. The plan proponent must introduce sufficient current financial information about the debtor, his assets and liabilities, and his prospects to permit the court to judge whether the test has been satisfied. *Id.*

■ The Debtors and the Committee presented extensive evidence at the confirmation hearing bearing on the best interests test. Likewise, NationsBank devoted much of its evidence to this issue. The Court finds that the best interests test under Section 1129(a)(7) is met as to each holder of a claim or interest in the three impaired classes under the Plan—Class 7A, Class 9, and Class 11. None of those classes voted unanimously to accept the Plan. However, each holder in the classes will receive under the Plan at least as much as it would receive in a liquidation.

### 1. Equity Value

The Disclosure Statement estimates the equity value of the reorganized Debtors to be $31.5 million. Mr. Holmes of Arthur Andersen testified that he determined the equity value set forth in the Disclosure Statement. He used a market multiple approach to derive the Debtors' value based upon the value of their two closest market comparables, Hancock and Fabricenter. Both Hancock and Fabricenters are publicly traded companies. Mr. Holmes determined from Value Line and other information sources that Hancock was trading at a multiple of EBITDA slightly above 10 and that Fabricenter was trading at a multiple of EBITDA slightly above 7. Considering Fabricenter to be a closer comparable, he determined that it was appropriate to use a multiple of 7 for the Debtors. He applied the multiple to the Debtors' projected EBITDA of approximately $4.8 million. After consulting with his partner Mr. Steven Matt, who specializes in formal appraisals of businesses, including stock values, Mr. Holmes determined to offset a projected increase in the seasonal draw on the Debtors' line of credit against a corresponding increase in working capital invento-

ry. Finally, Mr. Holmes deducted secured debt of $2.1 million to produce the equity value of $31.5 million.

At the confirmation hearing, Mr. Holmes testified that his opinion of the equity value had not changed since preparation of the Disclosure Statement. Following Nations-Bank's objection, Mr. Holmes requested Mr. Matt to test the reasonableness of the $31.5 million figure. Mr. Matt performed a more extensive market multiple analysis, using the quoted stock prices for Hancock and Fabricenters for August 9, 1995, August 24, 1995, and a 30–day average period ending August 24, 1995. Based upon that analysis, which is summarized in Exhibit 12, Mr. Matt determined that the equity value of the reorganized Debtors ranged between $31.3 and $33.0 million. In his opinion, $31.5 million was a reasonable estimate of the equity value. Mr. Rayburn also concurred with Mr. Holmes' opinion of the equity value. Mr. Torre, who has extensive experience in valuing businesses for Prudential, viewed the equity value of the reorganized Debtors as exceeding $31.5 million. In addition, Messrs. Holmes and Matt each expressed the opinion that the reorganized Debtors would likely sell for more than their $31.5 million equity value because of a control premium of at least 20 percent.

Mr. Holmes testified that the equity value of the Reorganized Company translates into a value of $31.50 for each share of New Common Stock to be issued to Class 9 creditors. There are approximately $100,000,000 of unsecured claims in Class 9. Because the Plan provides that 1 share will be distributed for each $100 of claims, it is anticipated that Class 9 creditors will receive a total of 1,000,-000 shares. Mr. Holmes divided the total shares into the equity value of $31.5 million to determine the value per share in the hands of each holder. The per share value of $31.50 will not be diluted by the Plan's management stock option program which could result in distribution of up to an additional 100,000 shares, because to buy stock under the program, management must pay into the Reorganized Company an option price equal to $31.50 per share.

According to Mr. Holmes, there are three general levels of stock value: (1) control value, (2) freely traded minority value, and (3) closely held value. The stock prices for Hancock and Fabricenter, which he used in valuing the New Common Stock, represent freely traded minority values. By contrast, the New Common Stock will not be publicly traded when distributed on the Effective Date. This lack of marketability suggests some discount in value from the freely traded minority values of Hancock and Fabricenter. However, because claims have traded in these cases and based upon his experience in other chapter 11 cases, Mr. Holmes believes that a secondary market will be created for trading in the New Common Stock. For that reason, he views the lack of marketability discount as being smaller than if the New Common Stock were closely held with little or no trading. In addition, Mr. Holmes considers the lack of marketability discount to be offset by the possibility that the Debtors are sold after the effective date and, through the "drag along" provision, the control premium is realized by all shareholders, including those with minority interests. Based on these and other considerations, Mr. Holmes concluded that the value to holders of $31.50 per share is not reduced by the fact that the New Common Stock will not be publicly traded on the effective date of the Plan. Mr. Matt reached the same conclusion.

■■■■■ The Court accepted Mr. Holmes as an expert to render opinions regarding the best interests test of Section 1129(a)(7), including equity and liquidation values. He is the national director of the bankruptcy group at Arthur Andersen, has more than 20 years of experience in the bankruptcy field, is a certified insolvency and reorganization accountant, and is a fellow of the American College of Bankruptcy. He has provided professional services to clients in more than 500 bankruptcy cases, including other fabric and craft retail cases, and has testified as an expert on equity and liquidation values under the best interests test in more than 100 cases. Mr. Matt qualified as an expert to render opinions regarding equity values of businesses, including valuation of securities. Mr. Matt is a professional business appraiser who has rendered both formal appraisals and

estimates of values. He has appraised the value of securities in more than 100 cases. He is an accredited senior appraiser with the American Society of Appraisers. Based upon their credentials as experts and the nature and substance of their testimony, the Court gives great weight to the expert opinions of Messrs. Holmes and Matt.

■ Although NationsBank raised a number of objections to the methodology employed and conclusions reached by the proponents' valuation experts, it offered no persuasive evidence or expert opinion of a different equity value for the Reorganized Company or of a different value for the New Common Stock in the hands of Class 9 creditors. NationsBank's principal witness in this regard was Mr. W. Allen Rogers. The Court recognized Mr. Rogers as an expert in valuing securities, but the weight of his opinion testimony is limited by the fact that he has no experience in valuing securities issued under a chapter 11 plan and that he spent relatively little time learning about the Debtors and their reorganization cases. For example, Mr. Rogers criticized the proponents' experts for using Hancock and Fabricenters as comparables because he believed they had "experienced management" unlike the Debtors. However, through cross-examination, it became evident that Mr. Rogers knew virtually nothing about the Debtors' management team, let alone their level of experience. He also admitted that "you [i.e., the proponents] have probably used the only decent—available comparables that you can," and then immediately retracted the testimony, stating instead that Hancock and Fabricenter were not the best comparables. Mr. Rogers offered no opinion as to which company or companies would be better comparables. Finally, the Court does not agree with Mr. Rogers' opinion that the best method for valuing what holders in Class 9 will receive under the Plan is to determine the break-up, liquidation value of the Reorganized Company.

■ Mr. McNeil, NationsBank's representative on the Committee, testified that during the course of the contested confirmation proceedings, the bank invited bids to see what price its claim would bring. Nations-Bank did not explain or comment on the contested confirmation proceedings to any of the brokers or potential bidders. Brokers and bidders were left to speculate for themselves. The deadline for submitting bids was the Friday before a three-day holiday weekend. No negotiations were conducted with respect to the bids. The Court finds that this "bidding" of NationsBank's claim does not reasonably reflect the value of New Common Stock to be distributed to Class 9 creditors. More probative of value is Mr. McNeil's statement to Mr. Rayburn around the time of the Disclosure Statement hearing that NationsBank would not consider selling its claim for less than 30 cents on the dollar.

Based on all the evidence, the Court finds that the Debtors and the Committee have established that the value of the New Common Stock to be distributed to Class 9 creditors is $31.50 per share which represents a return on claims of 31.5 percent.

## 2. Liquidation Value

The Disclosure Statement contains an analysis of the value to unsecured creditors in the event the Debtors were liquidated under chapter 7 as of an assumed effective date of August 26, 1995. The analysis includes an estimate of the proceeds to be realized from inventory and other assets including potential recoveries from preference actions, accounts for the payment of secured debt, and estimates liquidation costs, postpetition current liabilities, and administrative and priority claims. Under this analysis the net assets available to unsecured creditors in a liquidation is $16.8 million, and the percentage recovery to unsecured creditors is 14.9 percent.

■ The liquidation analysis in the Disclosure Statement was prepared by Mr. Michael Callahan, a manager at Arthur Andersen. Mr. Callahan has worked for the Committee and the Debtors in these cases since Arthur Andersen was first retained in June, 1993. He was supervised by the partners on the engagement—Mr. Rayburn and his successor, Mr. Holmes. Mr. Callahan's experience with the Debtors includes store closings and related GOB sales which have been con-

ducted during these reorganization cases. Mr. Callahan is a certified public accountant with experience in the field of bankruptcy, including experience in preparing and reviewing liquidation analyses in chapter 11 cases. The Court recognized Mr. Callahan as an expert regarding liquidation analyses in reorganization cases.

Mr. Callahan testified at the confirmation hearing concerning the liquidation analysis in the Disclosure Statement and a sixteen-page supporting summary of his calculations and methodology which was admitted in evidence as Exhibit 9. In its written objection to confirmation and in its deposition of Mr. Callahan, NationsBank raised a number of questions concerning the liquidation analysis in the Disclosure Statement. Thereafter, Mr. Callahan spent approximately five days evaluating NationsBank's objections and doing further work to refine his liquidation analysis. At the confirmation hearing, Mr. Callahan gave his opinion as to those objections which he believed had validity and those which did not. He acknowledged that the figures he used in the Disclosure Statement for store level expenses and the liquidator's commission were too high. However, he disagreed with NationsBank's contention that the figures were too high for a physical inventory by RGIS, for administrative fees, and for satisfying the IRS's priority claim, and he explained the reasons for his disagreement. Mr. Callahan also explained other refinements which he believed would be appropriate to update the liquidation analysis, some of which involved points not raised by NationsBank. Taking all of these adjustments and refinements into account, Mr. Callahan gave his opinion that the net recovery to unsecured creditors in the event of a chapter 7 liquidation would be $17.7 million, or a percentage recovery on claims of 15.9 percent. Mr. Holmes, the Arthur Andersen partner who supervised Mr. Callahan, testified that he reviewed and approved the liquidation analysis and that he agreed with Mr. Callahan's opinion regarding liquidation value.

▮▮▮▮ NationsBank's principal witness on the issue of liquidation value was Mr. Alan Glazer. The Court accepted Mr. Glazer as an expert qualified to give opinion testimony in the field of liquidation, reorganizations and financial workouts. Mr. Glazer did not give an opinion of the liquidation value of the Debtors. Instead, his testimony focused on criticizing certain aspects of Mr. Callahan's analysis. Mr. Glazer proposed specific "savings" in a liquidation totalling $4.9 million as well as other unspecified savings that could push the total to $10.0 million. The Court does not find Mr. Glazer's criticisms to be persuasive except insofar as they were recognized and accounted for by Mr. Callahan in his adjusted liquidation value of $17.7 million. Mr. Glazer was of the opinion that lease cancellation expense would be less than what Mr. Callahan included in his analysis. He assumed that ten percent of the expense would be mitigated by assigning the Debtors' store locations to other lessees. However, that assumption is belied by the Debtors' actual experience trying to assign the store locations which were closed during these cases. Despite considerable effort, not a single assignee was obtained for any of the locations. The Court also rejects Mr. Glazer's assumption that a professional liquidator would charge a two and one half percent (2.5%) commission and finds that it is more reasonable to assume, as Mr. Callahan did, that the liquidator's commission would be three percent (3.0%) which equals the actual commission charged by the professional liquidator in these cases in connection with GOB sales. Finally, Mr. Glazer's opinion that August 26, 1995 would be the "wrong time to liquidate" and that a higher recovery could be achieved if the liquidation were deferred until December or January is not helpful to the Court in determining the liquidation value under Section 1129(a)(7) for confirmation of this Plan. Although it may have been more appropriate for the proponents of the Plan to choose a hypothetical effective date in September rather than August, it would not have been appropriate to assume that the effective date would be deferred until December or January. There is no evidence that the recovery to unsecured creditors would change materially if a chapter 7 liquidation were conducted in September rather than August. Moreover, at least some of the delay in confirming and effectuating the Plan

is due to NationsBank's objections to confirmation and its motions for relief from the confirmation order and for extension of time to appeal. The proponents of the Plan are not required to anticipate that delay in projecting a hypothetical effective date for purposes of Section 1129(a)(7).

### 3. Conclusion

Based on all the evidence, the Court finds (i) that the equity value of the Reorganized Company and the value of the New Common Stock is $31.5 million, (ii) that the value of a share of New Common Stock to each holder of a Class 9 claim is $31.50, or a percentage recovery on claims of 31.5%, and (iii) that the liquidation value to unsecured creditors is in the range of $16.8 to $17.7 million, or a percentage recovery on claims of 14.9% to 15.9%. Because each holder of a Class 9 claim will receive stock under the Plan worth significantly more than its share of the liquidation value, the Court finds that the best interests test of Section 1129(a)(7) is met as to that class. With respect to Class 7A, each holder will receive under the Plan a cash payment upon the effective date of no less than 50% of its claim. This clearly exceeds the liquidation value and Section 1129(a)(7) is satisfied as to Class 7A. Holders of interests in Class 11 will receive no property under the Plan, but neither would they receive anything in a chapter 7 liquidation. Accordingly, the Court finds that Section 1129(a)(7) is satisfied as to Class 11.

### IMPAIRED ACCEPTING CLASS

Section 1129(a)(10) requires that at least one impaired class vote to accept the plan without regard to the vote of any insider. The Court finds that there are two impaired classes which have accepted the Plan, namely Class 7A and Class 9. According to the Summary of Voting on the Plan of Reorganization as corroborated by the testimony of Mr. Rayburn, there were 108 acceptances and only 9 rejections in Class 7A. In terms of claim amounts, acceptances totalled $97,786 and rejections totalled $13,629. Thus, Class 7A voted to accept the Plan by approximately 92% in number and 88% in amount, far exceeding the minimum requirements for acceptance set forth in Section 1126. As indicated above, the Court finds that Class 7A is a proper impaired class and was not created by the Debtors and the Committee to gerrymander voting and assure compliance with Section 1129(a)(10).

Likewise, the evidence establishes that voting by Class 9 creditors comfortably exceeds the minimum requirements for acceptance under Section 1126. Irrespective of amended ballots, there were 144 acceptances and 38 rejections in Class 9. In terms of claim amounts without regard to amended ballots, acceptances totalled $79,942,021 and rejections totalled $17,901,414. Counting amended ballots, the total for acceptances would increase to $80,125,998 and the total for rejections would decrease to $17,790,562. In a letter which NationsBank sent to all Class 9 creditors and introduced as Exhibit 6 at the confirmation hearing, the statement is made that "[i]f you have already returned a ballot accepting the plan, you may change your vote by returning an amended ballot." This advice to creditors is erroneous. Ballots, once cast, may not be changed or withdrawn without the Court's permission, for cause shown, after notice and hearing in accordance with Bankruptcy Rule 3018. No party has sought the Court's permission to change any ballot on the Plan. Accordingly, the amended ballots will not be counted. The Court notes that if the amended ballots were counted, the effect would be to increase the margin of acceptance by Class 9. As it is, Class 9 voted to accept the Plan by approximately 79% in number and 82% in amount.

: NationsBank has asserted that Prudential (including its affiliate Pruco Life Insurance Company) are "insiders" of the Debtors and that, therefore, their respective votes in favor of the Plan must be excluded under Section 1129(a)(10) in determining whether Class 9 creditors have accepted the Plan. Based upon the evidence and applicable legal authority, the Court finds that Prudential is not an "insider."

To be an "insider" under Section 101(31) of the Bankruptcy Code, Prudential would have to be an "affiliate" of the Debtors or otherwise in control of the Debtors. "Affiliate" is

defined under Section 101(2) to include "an entity that directly or indirectly owns, controls, or holds with power to vote, 20 percent or more of the outstanding voting securities of the debtor...."

Although NationsBank argues that "Prudential has the voting power to control a full 33% of the pre-petition board of directors of Piece Goods Shops Corp. (the "Company") and that this power is in addition to its control of 35% of the Reorganized Company's Common Stock," an analysis of Prudential's holdings and the evidence before the Court establish that Prudential, although an equity holder in the Company, did not own any "voting securities" that could give it the voting power to render it an affiliate nor did it ever control any member of the Company's pre-petition board of directors.

Prudential's holdings are described in that certain Note and Stock Purchase Agreement, dated February 7, 1989 (the "Agreement"), under which Prudential purchased various issues of debt securities of the Partnership of which approximately $61 million in principal remains outstanding (the "Notes"). The Company guaranteed payment of the Notes. Under the Agreement, Prudential also purchased 100% of the issued and outstanding shares of the Class B Common Stock of the Company (the "Class B Stock") and the 10% PIK Preferred Stock of the Company (the "Preferred Stock"). The Class B Stock represents 35% of the common stock of the Company. The other 65% is comprised of Class A Common Stock. Significantly, Prudential does not own any shares of the Company's Class A Common Stock which, pursuant to the Company's Certificate of Incorporation, entitles its holders to all voting rights, including the present right to vote for the election of the Company's board of directors.

Pursuant to the Company's Certificate of Incorporation, holders of Class B Stock have voting rights only relating to the following extraordinary corporate actions:

    a.   merger or consolidation of the Company;

    b.   sale, lease, exchange or other disposition of substantially all of the assets of the Company or the Partnership;

    c.   increase, in any manner of the authorized number of the Company's capital stock;

    d.   reclassification/recapitalization of the capital stock of the Company;

    e.   amendment to the Company's Certificate of Incorporation or By–Laws; or

    f.   amendment to the Company's bonus plan or enactment of any similar plan.

Similarly, holders of the Preferred Stock have voting rights only relating to the following extraordinary corporate actions:

    a.   any attempt to amend, alter or repeal the Certificate of Incorporation in a way which would adversely affect the powers, preferences or rights of any share of the Preferred Stock;

    b.   any attempt to authorize, issue, create or increase the authorized amount of any capital stock ranking senior to or on a parity with the Preferred Stock, other than as specified by the Agreement; or

    c.   any attempt to merge with any entity or sell, lease, exchange or otherwise dispose of all or substantially all of the Company's or the Partnership's assets.

The holders of the Preferred Stock also have a contingent right to elect two directors of the Company in the event dividends payable are in arrears and unpaid for two consecutive periods or if the Company fails to discharge a mandatory redemption obligation. However, the terms of the directors elected by the holder of the Preferred Stock terminate as soon as financial defaults are cured. Clearly, the right to elect directors is intended as a financial remedy and not as a grant of control to the holder of the Preferred Stock. Further, given that the Company could opt to pay dividends in kind, rather than cash, for all dividend periods prior to September 15, 1995, no realistic opportunity to elect directors based on two consecutive missed dividends could have occurred as of the date of the confirmation hearing.

The Class B Stock and Preferred Stock held by Prudential were economic interests and were vested with limited voting rights directly related to the protection of Pruden-

tial's economic investment. These rights do not equate to control or management of the business and affairs of the Debtors. That is the province of the board of directors, and all voting power to elect directors of the Company was vested in the Class A Common Stock.

Accordingly, neither the Class B Stock nor the Preferred Stock held by Prudential would constitute "voting securities" as that term is used in the Code's definition of "affiliate." Indeed, the Securities and Exchange Commission (the "SEC") defines "voting securities" for all corporate purposes as "securities the holders of which are presently entitled to vote for the election of directors." 17 C.F.R. § 230.405 (1992). Congress did not redefine the term for bankruptcy purposes, and, in fact, did state in the legislative history of Section 101(2) that the provision defining "affiliate" is "intended to cover situations where there is an opportunity to control" a debtor. H.R.Rep. No. 595, 95th Cong., 1st Sess. 308 (1977), U.S.Code Cong. & Admin.News 1978, pp. 5787, 6265. Courts have effectuated this expressed legislative intent in holding, consistent with the SEC definition of "voting securities," that the extent of a security holder's voting power is the appropriate measure of determining whether one is an "affiliate" of a debtor for "insider" purposes. *In re Tyee Timbers, Inc.*, 139 B.R. 520, 525 (Bankr.D.Or.1992) (any preferred stock voting power arising from the state law grant of voting rights on extraordinary events such as business combinations, disposition of the debtor's property and corporate charter amendments, did not give the preferred shareholders the "opportunity to control" the debtor, and consequently, the preferred stock did not constitute "voting securities" for determining insider status); *In re UVAS Farming Corp.*, 89 B.R. 889, 892 (Bankr.D.N.M.1988) (determination of affiliate status was based on percentage of voting control not percentage of stock ownership). *In re Locke Mill Partners*, 178 B.R. 697 (Bankr.M.D.N.C.1995), a case recently decided in this district, is consistent with the foregoing authorities. The court there determined that the debtor owned more than 20% of the voting securities (albeit not evidenced by stock certificates) of the creditor who voted in favor of the plan, based upon voting rights which enabled the debtor to control the election of four of eight directors.

In *Locke Mill*, the court also considered the question of "control" outside the technical definition of "affiliate" and examined, as between the debtor and creditor in that case, the "relative degree of control which either has over the other." *Id.* at 703. The court disqualified the vote of the creditor on the basis of "insider" status because the debtor exercised complete control over the board of directors of the creditor. *Id.* Prudential cannot be compared to the "insider" in *Locke Mill.* Prudential did not control or vote for any directors. It never attended a board meeting, even as an observer. At best, Prudential's Preferred Stock gave it a contingent right to elect two directors based on two consecutive missed dividends, a right which, as of the date of the confirmation hearing, was never a reality.

NationsBank further argued that the mandatory redemption obligations under the Preferred Stock designations became effective, thus giving Prudential the right to elect two directors, because the commencement of these chapter 11 cases resulted in the acceleration of Prudential's Notes. Such rights are not analogous to normal shareholder rights to elect directors, which are not remedies for financial defaults and which typically continue after bankruptcy. Needless to say, had Prudential attempted to elect two additional members to the board based on a failure to meet a mandatory redemption obligation triggered by the chapter 11 filing, NationsBank and other parties in interest would have claimed that Prudential was exercising a remedy on account of a pre-petition claim and should be subject to the automatic stay.

Even if the right to elect directors had accrued, the "control" requisite to insider status would require that such right be exercised, or at least threatened to be exercised. It is uncontroverted that Prudential never exercised or threatened to exercise such rights. In *Germain v. RFE Investment Partners IV, L.P., (In re Wescorp, Inc.)*, 148 B.R. 161 (D.Conn.1992), the bankruptcy

court held that a creditor was not an insider even though

- the creditor had the right to elect a majority of the debtor's board of directors upon a default under the creditors' loan agreement;
- the compensation of the debtor's principals was subject to the creditor's approval; and
- the creditor held warrants to purchase approximately 13% of the debtor's common stock.

*Id.* at 163.

Because "the provisions of the loan agreement which might have led to control of the debtor were *never implemented or threatened to be implemented,*" the lender was found not to be an insider. *Id.* (emphasis added). *See also, In re Technology for Energy Corp.,* 56 B.R. 307, 316 (Bankr.E.D.Tenn. 1985) (A secured creditor of the debtor attained voting control of the debtor's stock, but because the creditor never exercised voting control, the court held that it was not an insider.)

■ Finally, the primary objective of the exclusion of insider votes under Section 1129(a)(10) is to nullify the voting of a creditor who is so beholden to, or controlled by, the debtor as to be effectively an alter ego of the debtor. *In re Gilbert,* 104 B.R. 206 (Bankr.W.D.Mo.1989). Where there is an affinity of interests between a creditor and the debtor, that creditor is less likely to cast a vote formed on an independent judgment of what will best serve his interests, much less those of his fellow class members. *Id.* The holders of equity interests in the General Partner Debtor are not receiving any property or other rights under the Plan. Accordingly, the nature of the Plan itself and the fact that there is no motivation on the part of Prudential to favor any interest other than its interest as a creditor counters any contention that Prudential is an insider whose vote would not serve the purposes of Section 1129(a)(10).

## FEASIBILITY

■ The final confirmation standard to be addressed is "feasibility" under Section 1129(a)(11). This means that confirmation of the Plan is not likely to be followed by liquidation. Feasibility does not require that the Plan's success be guaranteed, but only that it offer reasonable assurance of success. *E.g., Kane v. Johns–Manville Corp.,* 843 F.2d 636 (2nd Cir.1988). In assessing feasibility, the Court may consider the capital structure of the reorganized Debtors, their projected earning power, economic conditions, management's ability and likelihood of continuing to work for the reorganized Debtors, and any other factors relevant to performance of the Plan. *E.g., In re Polytherm Industries, Inc.,* 33 B.R. 823 (W.D.Wis.1983).

■ The Court finds that the Plan is feasible within the meaning of Section 1129(a)(11). By distributing all of the equity in the reorganized Debtors to the Class 9 creditors and resisting NationsBank's proposal of adding a debt instrument, the proponents have deleveraged the business. The existing secured debt—$2.1 million secured by the warehouse distribution facility—is minimal. The exit financing facility of $20,000,000 is reasonable and necessary to encourage vendor support and to fulfill the business plan, including but not limited to, making investments in management systems and conversions to Home Centers. Through actual performance over the past year or so, Home Centers have proven to be profitable and are therefore a reasonable cornerstone of the Debtors' business plan. Although the Debtors have had difficulty meeting many of their past projections, recent trends are encouraging. Specifically, the evidence shows that for the first quarter of FY 1996 (which also is the first quarter of projections in the Disclosure Statement), the Debtors exceeded their projected targets for EBITDA. The projections in the Disclosure Statement are endorsed by the Debtors and by the Committee (with the exception of NationsBank). The Court finds those projections to be reasonable and supportive of feasibility.

■ Feasibility is enhanced by the substantial restructuring which the Debtors have achieved while operating in chapter 11, including but not limited to the closing of unprofitable stores, the investment in point-of sale registers, the development and imple-

mentation of the Home Center concept, and the assembly of an experienced management team in which most creditors repose confidence. Indeed, the fact that the Plan is proposed by the Committee as well as the Debtors increases the likelihood that it will succeed. Similarly, the fact that the creditors voted overwhelmingly to accept the Plan suggests that it is more likely to succeed than if the vote were closer.

■ The industry within which the Debtors operate is volatile. However, as a result of significant store closings including those by the Debtors and by House of Fabrics, another fabric/crafts retailer in chapter 11, the over-stored condition of the industry has been somewhat alleviated. Moreover, the Debtors have had some recent success in resisting the industry's deep discounting. The result for the first quarter of FY 1996 has been reduced sales (below targets) but increased margins (above targets) for the Debtors. Through the Home Center concept, the Debtors will also be able to expand into markets other than traditional fabrics and crafts. In sum, problems with the industry do not render the Plan infeasible.

The Plan rewards management with a retention bonus and creates an incentive, through a stock option program, for management to continue working for a reasonable period of time. Moreover, the option program incentivizes management to increase the value of the New Common Stock beyond its worth at the effective date of the Plan. These provisions relating to management support feasibility.

## CONCLUSION

The Plan meets all of the applicable requirements of Section 1129. NationsBank's objections to confirmation are overruled.